DEBORAH N. RONNEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

F. RITTER SHUMWAY AND ESTATE OF HETTIE L. SHUMWAY, SECURITY NORSTAR BANK, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 25736-83, 26816-83.    Filed January 21, 1988.

*Sherman F. Levey,* for the petitioner in docket No. 25736-83.

*J. Kevin Mahoney,* for the petitioners in docket No. 26816-83.

*Edward D. Fickess,* for the respondent.

CLAPP, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

|  | Year | Amount |
| --- | --- | --- |
| Deborah N. Ronnen | 1978 | $77,895.00 |
| (docket No. 25736-83) | 1979 | 27,185.00 |
|  |  | 105,080.00 |

|  | Year | Amount |
|---|---|---|
| F. Ritter Shumway and | 1975 | $ 26,160.54 |
| Estate of Hattie L. Shumway | 1977 | 49,168.86 |
| (docket No. 26816-83) | 1978 | 29,041.67 |
|  |  | 104,371.07 |

These cases were consolidated for trial, briefing, and opinion on September 19, 1985. Docket No. 25736-83 has one additional issue for determination. After concessions by the parties, the issues for decision are: (1) Whether Health Systems Ltd. (HSL) was organized as part of a tax-avoidance scheme without business purpose or economic substance and must be disregarded for Federal income tax purposes; (2) whether the software purchased by HSL is tangible personal property or other tangible property eligible for investment tax credit; (3) whether the software was initially placed in service by HSL in 1978; (4) whether a nonrecourse note may be included in the basis of the software acquired by HSL; (5) whether HSL overstated the value of the software for purposes of section 6621(d);[1] and (6) whether petitioner Deborah N. Ronnen is entitled to business expense deductions attributable to International Measuring Tools (Israel) Ltd. (IMTI).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference.

The issues of these cases arise primarily from respondent's disallowance of deductions from HSL, an S corporation formed in 1978 to purchase a computer software package—Nursing Home Management Information System (software)—designed to assist nursing homes with the completion of complex State reporting requirements specific to that industry. HSL is a calendar year taxpayer.

Petitioners Deborah L. Ronnen (petitioner) and F. Ritter Shumway and Hettie L. Shumway[2] (Shumway or

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioner Hettie L. Shumway died following the initiation of this case, and Security

Shumways) were principal shareholders of HSL. Petitioner was a resident of Rochester, New York, at the time of filing her petition. For all relevant years, petitioner resided in the Nation of Israel. The Shumways were residents of Rochester, New York, at the time of filing their petition. Prior to the taxable years in question, F. Ritter Shumway was the chief operating officer of Sybron Corp. During 1978 and 1979, he was retired and owned a domiciliary care facility known as Mariner House.

In early 1978, the State of New York (New York) began a major revision of their Medicaid reporting requirements for nursing homes. The accounting firm of Peat Marwick and Mitchell (Peat Marwick) was retained to study and refine the existing regulations. New York then implemented new regulations based on the Peat Marwick recommendations which required a computerized accounting system and a new 78-page statistical report based on functional classifications. Prior to these regulations, most nursing homes used a manual accounting system based on natural classification. The statistics required on this new report were voluminous and technically complex, at times spreading in excess of 40 lines over 10 columns. Very few of the statistics required for this report had ever been tracked by the nursing home facilities. To assure compliance with the new regulations, enforcement authority was placed with New York's office of special prosecution. Failure to comply with the new regulations could result in criminal penalties.

At that time, Mr. James Phillipone (Phillipone), a Rochester attorney, contacted several Rochester professionals with clients in the nursing home industry and inquired about their clients' interest in a computer software package designed to assist them in complying with the new State reporting requirements. Those contacted included: Mr. Norman Spindelman (Spindelman), an attorney who represented at least 19 nursing homes in the area, and several outside the State; Mr. Edward Harris (Harris) and Mr. J. Kevin Mahoney (Mahoney), partners in the law firm of Harris, Beach, Wilcox, Rubin & Levey, the attorneys who represented the Shumways; Mr. Milton Fisher (Fisher) and

Norstar Bank, Rochester, New York, was appointed as the executor of her estate, which was substituted as a party in this proceeding by order dated Sept. 19, 1985.

Ms. Letty Schacht (Schacht), partners in the then firm of Fisher, Gumbiner & Schacht, C.P.A.'s, which represented at least 5 nursing homes in 1978. Schacht had been petitioner's business accountant since 1969, and her firm had been petitioner's family's accountants since 1951.

All the contacted parties expressed an interest in the package, primarily because they knew that the new reporting requirements would be substantial. Additionally, they believed that the nursing home owners would be receptive to a software package framed with their specific needs in mind and which specifically addressed the nursing home segment of the health care industry.

A meeting was organized by Phillipone on behalf of International Data Resources, Inc. (IDR), a Miami, Florida, corporation[3] interested in selling the rights to the software package to investors in the New York territory. The original meeting with the representative, a principal of IDR, was attended by, among others, Harris or Mahoney, Spindelman, Fisher, and Phillipone. Spindelman was there as the representative of Mr. Dennis Christiano (Christiano), the owner and operator of the Westgate Nursing Home in New York. Either Harris or Mahoney was there on behalf of Shumway. Schacht took two of her clients to the IDR presentation. The IDR representative was accompanied by a computer technician.

The original presentation from IDR highlighted the system, possible profits, and an outline of the proposed payment schedule. IDR also had a list of the nursing homes (with bed size) in New York, and an estimate of the percentage of homes required to make a profit.

The offering memorandum proposed the purchase of the software for the price of $267,000 per territory: a cash investment of $36,000 and a nonrecourse note of $231,000. The introductory paragraph of the offering memorandum stated that:

[the] investment involves a high degree of risk, and consequently the purchase of the system should be considered only by persons who can afford total loss of their investment. * * *

        *        *        *        *        *        *        *

---

[3]IDR is an affiliate of National Data Corp. (NDC), and each had their place of business at 3050 Biscayne Blvd., Miami, Florida.

There is no public or other market for the resale of the system, nor is it anticipated that such a market will develop. * * *

The offering memorandum highlighted tax benefits including: (1) Software depreciation deductions, assuming a double-declining-balance method was used, and (2) the investment tax credit. The offering memorandum advised, however, that the memorandum was no guaranty of such tax consequences and was not binding on the Internal Revenue Service. An opinion by IDR's tax counsel, Levine & Fieldstone, of Miami, Florida, outlined in detail the possible risks. The offering memorandum and tax opinion summarized the risks of the investment as including challenges by the Internal Revenue Service regarding (a) the status of the purchaser as the sole and exclusive owner of the System and the rights thereto for Federal income tax purposes; (b) the inclusion of the full amount of the nonrecourse note in tax cost of the system; (c) the depreciation method used; and (d) the availability of the investment tax credit.

The offering memorandum described the economic risks associated with the investment as including: (a) Competition in the computer program industry; (b) necessity for active marketing and promotion; (c) technological changes and potential obsolescence of the software; (d) developing microcomputer technology which may render the hardware system obsolete; (e) unauthorized use and pirating of the system; and (f) a limited sales market. Moreover, the offering memorandum cautioned that:

A prospective Purchaser probably has limited or no experience in the computer software industry and, due to his unfamiliarity, may be unable to generate a profit with which to repay the non-recourse note. The principal source of income is expected to be revenues from the distribution and use of the System by nursing homes. Accordingly, the success of such distribution is mainly dependent upon the distributor used by the Purchaser, and although the Seller believes that the Distributor that it has recommended is capable, there can be no assurances that such Distributor will be successful in distributing the System. [Emphasis omitted.]

The offering memorandum also included a detailed description of the system, and a general description of the computer industry.

The NHMIS system software as articulated in the offering memorandum was designed to:

1. Assure nursing homes of being in compliance with applicable State and Federal laws.
2. Assure the receipt of monies due nursing home facilities from not only Medicaid, but also Medicare, Private Insurance and Private Pay.
3. Reduce substantially the cost of third party billings for nursing homes.
4. Reduce both audit time and charges for nursing homes.
5. Minimize the costly loss of ancillary charges.
6. Determine costs on a per patient day basis, month and year.

The system was comprised of "six totally integrated modules" which could be installed and/or operated individually or as a total package. The six modules were comprised of:

> Accounts payable
> payroll
> Accounts receivable
> Fixed assets and depreciation
> General ledger
> Profit and loss.

Thus, a purchaser of the system would receive:

I. Tape of all object modules

   A. Receivables - mainline
   B. Payables - mainline
   C. Payroll
   D. Depreciation
   E. General ledger - mainline
   F. Profit and loss - mainline
   G. Miscellaneous programs (File load and start).

II. Tape of all job control language (PROCS - DOS)

   A. Mainline
   B. Payroll
   C. Depreciation

III. Tape of all documentation

   A. Mainline system documentation
      1. Introduction
      2. Program listing
      3. Report listing and module cross index
      4. General ledger source table
      5. Module description - files - programs
      6. Disk record layouts

7. Input record layouts
8. Operation run book (computer)
9. Data entry manual
10. Data entry layout book

B. Payroll system documentation
  1. Introduction
  2. Program listing
  3. Report listing and module cross index
  4. Module description - files - programs
  5. Disk record layouts
  6. Input record layouts
  7. Operation run book (computer)
  8. Data entry manual
  9. Data entry layout book

C. Fixed asset and depreciation documentation
  1. Introduction
  2. Program listing
  3. Report listing and module cross index
  4. Module description - files - programs
  5. Disk record layouts
  6. Input record layouts
  7. Operation run book (computer)
  8. Data entry manual
  9. Data entry layout book

D. In house clerical operations manual

E. Training and client installation manual

IV. Sample input forms

V. Sample computer output forms

VI. Technical support for distributor systems installation

VII. Training for distributor operations

A. System operations
B. Clerical operations
C. Client interface (installation)

VIII. Files (tape)

A. Chart of accounts
B. Chart of accounts grouping
C. General ledger source codes

In addition to reviewing the offering memorandum, the investors conducted preliminary research on IDR. IDR claimed that they serviced three homes in operation in Florida. Spindelman, therefore, contacted a client of his from the Rochester area, John Seefried (Seefried), who

owned a large nursing home chain in Florida. Spindelman concluded that the representations made by IDR were accurate, based on Seefried's report that the homes were generally satisfied with the systems as they were operating. The parties also contacted the New York State Nursing Home Association (NYSHA), to solicit their informal opinion of the value of a computerized reporting system which incorporated the new reporting requirements. Jay Durante, the then president of the association, appeared very interested. This research, coupled with the impending revision of the New York system, made the software an attractive investment package.

The investors then began further negotiations with IDR, and three problems became apparent with respect to the investment.

First, Mr. Gregg (Gregg), the president of IDR, did not want any nursing home proprietors as investors. He felt this would impede sales to other nursing homes concerned that a shareholder/nursing home owner would be in a position to review the customer homes' books and records. Gregg suggested that Spindelman, Harris, and the other professionals might want to invest in the package due to their familiarity with the nursing home industry. On Schacht's and Harris' suggestion, petitioner and Shumway invested as well.

Second, the investors felt that the system would be overpriced for sale to the New York market alone. Rather than negotiate over price, negotiations developed over the territory and IDR offered to expand the number of States covered by the proposed agreement. As the system was originally designed for charges on a per patient basis, HSL secured a list of various homes in other States and the number of beds per home to determine the value of the software.

Third, the investors believed that the system would be worth less without inclusion of all the statistical reporting revisions. It was thought that the implementation of the Peat Marwick recommendations would distinguish HSL's software from any others introduced on the market. Each software package, however, would have to be modified for each territory in which the system was to be marketed.

Gregg flew to Rochester in an attempt to deal with these new considerations, and the final agreement incorporated these concerns.

On December 21, 1978, HSL and IDR closed the transaction. The documents used were virtually identical to those contained in the offering memorandum except for the negotiated changes relating to the "territory" and the revised statistical requirements. HSL would receive several States as part of their territory. The revised statistical reporting requirements based on the New York Peat Marwick recommendations were the primary focal point of the revised agreement.

Out of the purchase price of $3,759,500, HSL paid $295,000 cash to NDC at closing, and executed two recourse notes in the amounts of $155,000 and $65,450. At a later date, a nonrecourse installment promissory note totaling $3,244,050 was given. Under the terms of the nonrecourse note, interest was payable monthly at a rate of 6 percent of the gross revenues received, limited to the amount due on the nonrecourse note. The nonrecourse note was to bear no interest on the principal sum of $1,200,000 until such time as the changes based on the revised regulations were made. All investors signed the notes. No amounts were due until $515,450 in net revenues was received by HSL. Net revenues was defined as being the gross revenues obtained from the commercial exploitation of the software, less royalties, service fees, or distribution fees expressly tied to gross revenues, and which had a preference to any money payable or retainable by HSL. The $515,450 figure was determined by the sum of the cash paid plus the two recourse promissory notes. ($295,000 + $155,000 + $65,450.)

The notes and cash would be placed in an attorney's account in Rochester, with the understanding that IDR would be paid upon the completion of the incorporation of the revised requirements based on the Peat Marwick recommendations. If these were not completed by June 21, 1979, HSL reserved the right to withdraw from the deal, and their initial investment would be returned. HSL determined the 6-month period based on observations by John Mazur (Mazur), a computer expert with a master's degree in computer science from Yale University. Mazur was hired for

the express purpose of evaluating how long the implementation of the Peat Marwick recommendations would take and the amount required to be withheld. Additionally, Mazur would test the software at a later date to see if the proper changes had been made.

The service agreement originally provided that HSL remit to IDR and IDC 48 percent of all revenues generated from all areas as a "service fee." IDR and NDC also retained the right to sell computer software similar to HSL's system in HSL's territory so long as a 10-percent royalty was paid to HSL, by way of a set-off against the nonrecourse promissory note. This royalty could be as high as 20 percent of gross profits net of installation costs. Contemporaneous with its acquisition of the software, HSL also entered into a nonexclusive distribution agreement with Continental United Resources, Inc. (CUR), another affiliate of NDC, under which HSL agreed to pay a 12 percent "distribution fee" for all revenues generated from the use and exploitation of the system in the territory. The delivery of the system would occur within 90 days after closing, and IDR would deliver "the tapes, program, manuals and other materials described herein." The master source tape would be held in IDR's safe for security reasons and would be available to HSL on an as-needed basis. In fact, Phillipone made the payments in exchange for the above materials at closing.

The investors did not use any projections or any other analyses in making their decision to invest in HSL, or prior to the incorporation of HSL. They likewise did not calculate, project, or otherwise analyze the pre-tax or post-tax estimated profit or loss of HSL. Moreover, no marketing surveys or studies, either direct or indirect, were performed. Petitioner and Shumway had no working knowledge of, or professional expertise in, computer software, and neither HSL's officers nor any members of HSL's board of directors had experience in computer software design, operations, or marketing. Many of the investors, however, had considerable knowledge of the nursing home industry and the technical reporting requirements necessary to formulate a successful software package.

The investors did not request or obtain an appraisal of the software prior to its purchase, but the transaction was subject to the understanding that appraisals were to be furnished.[4]

Following the negotiations, HSL was incorporated in the State of Delaware on December 18, 1978. The number of shares issued and outstanding were 1,053; Shumway was issued 308 shares and petitioner, 200 shares. Spindelman, Phillipone, and Erdle were each issued 100 shares and Schacht received 20 shares. Phillipone became the president of HSL, Spindelman was retained as HSL's counsel, and Schacht became its treasurer. Her firm was retained to prepare HSL's Federal income tax returns.

HSL contemplated two types of computer services for clients. The first service contemplated a central area where information would be processed and then forwarded to clients. This was advantageous to the homes unable or uninterested in purchasing their own computers. The second service would provide for the sale of the hardware and software to homes which had computers on the premises. HSL would then install the equipment and be responsible for monitoring the systems and for repairs.

HSL at this time entered into an agreement with Christiano, Spindelman's client, for the use of his nursing home as an original pilot. The arrangement with Christiano provided for the first kind of service. The information was processed on IDR's Miami, Florida, computer, which was already running for both the Florida and New York systems, and then sent to the Westgate nursing home in New York. As HSL did not own a computer at this time, it was necessary for it to use IDR's facilities.

By mid-1979, it became apparent that there were problems, specifically with regard to IDR's ability or desire to fulfill certain conditions of the agreement.[5] The first set of problems concerned the implementation of the revised reporting requirements. In April or May 1979, IDR indicated

---

[4]It is unclear from the record whether the appraisals were in fact ever furnished to the investors.

[5]A letter from NDC to Phillipone, however, indicated that as of Mar. 13, 1979, apparently some progress had been made. Specifically, it noted that the technical work on the New York reporting requirements "is on schedule to be completed by Apr. 1, 1979. We are looking forward to supporting your effort in marketing and expect great market penetration with the knowledge we have of the State."

that the Peat Marwick recommendations were incorporated in the software. John Mazur was contacted and agreed to see if the appropriate changes had in fact been made. The test was done on a compatible computer. The system had not incorporated all the requirements of the new negotiations and HSL refused to make payment to IDC. A second test was run 2 months later which also indicated that the new reporting requirements had still not been incorporated into the software. HSL once again refused to make payment. IDR did not have the capacity or the money to complete the New York technical changes.

Harris and Spindelman flew to Miami where they met with William Segale (Segale), the man who designed the software. Segale indicated that there were not enough dollars to complete the job, but that with sufficient backing he could do so in a short period.

The second problem was that IDR was not fulfilling its obligations to market the software as earlier agreed. In fact, no marketing had been done by IDR at all.

Due to these setbacks, HSL terminated part of its relationship with IDR by agreement dated October 4, 1979, whereby IDR waived all the royalty rights it had, and would cease any marketing of the software on behalf of HSL.

Under a revised agreement of intent between IDR and HSL, however, HSL agreed to continue and in fact increase its service agreement and distribution agreement division of gross receipts from 60 percent of such receipts to 84 percent, 60 percent payable to Information Associates, Inc., the third party processor, and 24 percent payable to IDR. However, in the event a contemplated consulting agreement between Information Associates and IDR was terminated, the former would receive the entire 84-percent division of gross receipts. Any amounts received by IDR from HSL after this time would be applied in partial satisfaction of the nonrecourse promissory note.

HSL contemplated purchasing a computer of its own, and entering into agreements with other companies who could provide the processing. HSL was interested in finding a company that could process, service, maintain, and update the software.

In October 1979, HSL met with people from Finserve Computer Corp., a large computer company in Albany, New York, which had equipment that would be compatible with running HSL's software. The negotiations included HSL, NYSNHA, and Finserve. The arrangement proposed by Finserve was similar to the original financial arrangement between HSL, IDR, and NDC. Based on Finserve's dollar requirements, however, the return on investment by HSL did not seem appropriate compared to what the original expectations were, and HSL did not contract with Finserve for this service.

In August 1980, HSL hired Segale, an arrangement considered more profitable than the Finserve deal. Segale moved to Rochester with his family for the express purpose of setting up the entire system in Rochester. The employment agreement was entered into on August 1, 1980, and provided for payment of $22,608 per annum. Segale had completed the Peat Marwick requirements by the time he started to work for HSL.

Also, in August 1980, HSL rented office space in Rochester, New York, for the period commencing August 1, 1980, at a monthly rent of $500. The rental payments continued through March 1981. Prior to that, HSL's office was next door to Phillipone's office.

In September 1980, HSL purchased a used Honeywell Computer from International Data Resources for $71,404.96 in cash. Jack Erdle (Erdle), an HSL investor, supervised much of the installation of the computer as well as Mr. Segale's work, and became active in the company. In October 1980, HSL entered into a maintenance service agreement with Honeywell Information Systems, Inc.

The competition in the nursing home software field became apparent in 1980, just as HSL was organizing itself and its services. IBM had come out with a nursing home accounting system, which did not incorporate the Peat Marwick recommendations but had the IBM name and reputation associated with it. Other competitors had gotten into the field or were contemplating it. Spindelman learned of the existence of the IBM system when one of his clients asked him to negotiate a contract for the purchase of the IBM software and equipment.

HSL, nevertheless, continued its pursuit of business. HSL contacted Seefried, Spindelman's client, to work as a consultant and salesman for HSL in the New York area. Segale, Erdle, Schacht, Spindelman, Seefried, and Christiano were engaged in some type of marketing for the system. Schacht and Spindelman made their clients aware of the system, but did not recommend it. Seefried, however, finalized a contract on behalf of HSL in late 1980 with Rohm Services, the largest nursing home chain in Rochester. This occurred shortly after Segale moved to Rochester. HSL furnished services to them, although there is no indication whether payment by Rohm was ever made. Spindelman did not negotiate the contract with Rohm services. Erdle handled the negotiations, while Seefried and Segale handled the technical side of the deal.

The HSL board of directors meetings were regularly conducted once a month, usually at Spindelman's office. The investors were active and vocal, but no minutes of the meetings were kept. At most meetings, Mr. Norry, petitioner's brother, attended on her behalf.

From early 1979 to 1982, there were six calls for additional capital. The funds were used to cover the cost of operations, computer acquisition and supplies, employee salaries, consultation fees, and rent and utilities. Shumway for example, invested an additional $14,905 in September 1981. Overall, work was performed and homes were serviced. It had taken a while, however, to complete the implementation of the Peat Marwick requirements and to enter into a processing arrangement. In 1983, HSL sold the Honeywell computer for approximately $17,000 in a transaction handled by Erdle.

## IMTI

On her 1978 income tax return, petitioner in docket No. 25736-83 deducted a Schedule C business loss from IMTI in the amount of $36,238, which respondent disallowed in full in the notice of deficiency. This amount was comprised of $42,002 gross receipts less $65,800 cost of goods sold less deductions of $12,440. The facts involved in this issue are few and simple. During 1978, and for at least 10 years before that, petitioner resided in Jerusalem, Israel, and

carried on no commercial or business activities. Her father and brother, under a general power of attorney, invested portions of her funds from time to time. In 1978, petitioner's father determined that there would be a substantial market for the sale of measuring tapes and other such devices in the United States. These devices were to be manufactured in Israel and exported to the United States. Petitioner's father invested funds totaling $78,240 to engage in this business, which generated gross sales of only $42,002. Petitioner's accountant prepared her Schedule C from data given to her by a Mr. Hodes, the manufacturing representative for IMTI, and the distributor of the goods. The record contains no further information regarding this deduction.

## OPINION

### 1. (a) Economic Substance

If a transaction is entered into solely for tax benefits and without any other purpose, the form of the transaction will be disregarded and the tax benefits denied. *Gefen v. Commissioner*, 87 T.C. 1471, 1490 (1986); *Law v. Commissioner*, 86 T.C. 1065, 1093 (1986). A transaction will be recognized for tax purposes, however, if it has economic substance in that the transaction offers a reasonable opportunity for economic profit. *Estate of Thomas v. Commissioner*, 84 T.C. 412, 438 (1985); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 203 n. 17 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). The fact that a transaction generates tax benefits for its investors does not necessarily mean that the transaction lacks economic substance. *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 (1978); *Gefen v. Commissioner, supra; Estate of Thomas v. Commissioner, supra* at 432. We have summarized the holdings of such cases in *James v. Commissioner*, 87 T.C. 905, 918 (1986), by stating:

A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase or is otherwise fictitious (*Falsetti v. Commissioner*, 85 T.C. 332 (1985)), or (2) the transaction is devoid of economic substance consonant with its intended tax effects (*Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978);

*Knetsch v. United States,* 364 U.S. 361, 366 (1960)). The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance—features that have meaningless labels attached." *Frank Lyon Co. v. United States,* 435 U.S. at 583-584; *Estate of Thomas v. Commissioner,* 84 T.C. 412 (1985); *Hilton v. Commissioner,* 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).

It must be recognized that the tax laws affect the shape of every business transaction. The parties to a transaction are entitled to take into account and to maximize favorable tax results so long as the transaction is compelled or encouraged by non-tax business reasons. *Frank Lyon Co. v. United States,* 435 U.S. at 580.

We conclude that HSL's purchase and distribution of the software had economic substance because the record establishes that in December 1978, the purchase of the software by HSL offered a reasonable opportunity for economic profit exclusive of tax benefits. *Rice's Toyota World, Inc. v. Commissioner, supra.*

Our conclusion is based on several factors. First, the investors believed they had found an ideal investment opportunity by providing clients industry-specific software which they perceived to be lacking in the marketplace. This belief was further supported by the investors' knowledge of the impending Peat Marwick recommendations and their effect on the State nursing home reporting requirements. Second, the investors continued their efforts to perfect and market the software despite initial setbacks with IDR and NDC.

Respondent argues that the transaction was simply a prepackaged and abusive tax shelter, a take it or leave it deal where sophisticated and wealthy individuals made their purchases in a manner unlike the way rational businessmen conduct either established or venture businesses. We simply do not find that the evidence supports respondent's contentions.

The investors formed HSL to purchase and market software geared specifically towards the needs of the nursing home reporting requirements. In December 1978, the investors met with representatives of IDR and NDC and negotiated the corporations' transactions in a manner consistent with their interests. Spindelman, for example, negotiated for

changes in the original purchase and sales agreement, specifically as to territory and incorporation of the Peat Marwick recommendations. This was reflected by the fact that no payment would be made to IDC until the Peat Marwick recommendations were completed. In fact, the payments were not made until late 1979. Moreover, a second series of agreements were completed in August 1979 excluding IDR from royalty payments and from further involvement with the marketing of the software. While arm's-length negotiations over price were admittedly absent, the investors thought that their return on investment would be substantial based on the other arm's-length negotiated changes.

HSL's commitment to its investment is further bolstered by its continued effort to finish and market the software even after the transaction with IDR went sour. HSL hired Segale in August 1980 once it became clear that IDR would not uphold its part of the bargain. HSL purchased a computer for $71,404.96 to process the software data in Rochester. HSL hired Seefried as a consultant to market the software. As a result of the investors' knowledge and experience, they believed that the software would be a winner in the marketplace, and confirmed this belief by additional contributions to capital, combined with the time and effort required to implement the Peat Marwick recommendations.

Respondent argues that no marketing efforts were done, but we simply cannot agree, based on the evidence. Although Segale was a computer programmer, and Seefried and Christiano nursing home operators, this does not indicate that they were not qualified to market the software. Segale had a computer background and could obviously communicate the technical details of the package to interested investors. As nursing home operators, Seefried and Christiano could use their substantial contacts in the industry as a base to market the product. Respondent makes much of the fact that Spindelman and Schacht did not recommend the software to their clients. We find credible, however, the testimony of the witnesses that to recommend the software would have been a conflict of interest because of their professional relationship with the

parties. Moreover, the testimony indicates that they did make their clients aware of the software.

Finally, we note that the form of HSL's transactions matched their substance. There was a high degree of adherence to the contractual terms on the part of HSL. See *Gefen v. Commissioner, supra.* The transactions between HSL and IDR, and HSL and NDC were fully documented. The negotiations among the parties focused on legitimate business and economic factors and continued over a period of months as very real problems began to present themselves to the investors. This was not a situation where the investors took the deal "as is." While a majority of the contract was accepted outright, the investors focused on the territory and the technical changes and succeeded in incorporating these factors into the final agreements. Based on the record, we conclude that petitioner and Shumway did not invest in HSL solely for tax benefits.

### 1. (b) Activity for Profit

Respondent argues, however, that HSL was not engaged in an activity for profit within the meaning of section 183. We do not agree with this contention.

Section 183 provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in section 183(b). That section allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes, and the balance of the deductions to the extent that gross income from the activity exceeds deductions attributable to such expenses as interest and taxes. Sec. 183(b)(1) and (2). Thus, petitioner and Shumway's rights to ITC and depreciation deductions are dependent upon their showing that HSL "either constituted a trade or business or was undertaken and carried on for the production of income * * * . Essential to such a showing is a demonstration that HSL had an 'actual and honest objective of making a profit.'" See generally *Beck v. Commissioner,* 85 T.C. 557, 569 (1985), and the extensive listing of cases cited therein.

The rule of business purpose applies to subchapter S corporations. *Eppler v. Commissioner,* 58 T.C. 691 (1972).

The expectation of making a profit need not be a reasonable one; it is sufficient if there is a bona fide objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; *Fox v. Commissioner,* 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner,* 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Zemel v. Commissioner,* 734 F.2d 9 (3d Cir. 1984), *Rosenblatt v. Commissioner,* 734 F.2d 7 (3d Cir. 1984), *Krasta v. Commissioner,* 734 F.2d 6 (3d Cir. 1984), *Leffel v. Commissioner,* 734 F.2d 6 (3d Cir. 1984), *Hook v. Commissioner,* 734 F.2d 5 (3d Cir. 1984). The term "profit" in this context means economic profit, independent of tax savings. *Surloff v. Commissioner,* 81 T.C. 210, 233 (1983). The issue of whether there is the requisite objective to make a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case. Sec. 1.183-2(b), Income Tax Regs.; *Golanty v. Commissioner,* 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The burden of proving the objective to make a profit is on petitioners. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Greater weight is to be given to objective facts rather than to the parties' mere statements of their intent. Sec. 1.183-2(a), Income Tax Regs.; *Fox v. Commissioner, supra* at 1007.

In determining whether an activity is engaged in for profit, we must consider a nonexclusive list of some relevant factors contained in section 1.183-2(b), Income Tax Regs. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on the other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

Respondent contends that the hoped for tax benefits were the dominant and primary objective for the investment in

HSL. Respondent argues that HSL was formed and operated solely for the purpose of generating tax deductions for its shareholders, and the manner in which HSL was operated proves that there was little or no chance of the company's ever producing an economic profit. Petitioners contend that although this was a high-risk investment, and although they were not active in the business dealings of HSL, overall the investors made every effort and spent a substantial amount of time and money in an attempt to make the software a financial success. At trial and on brief it has been maintained that the activities of HSL were engaged in for profit. Based on all the evidence presented at trial, we conclude that petitioner and Shumway have sustained their burden of proving that HSL was in fact a business invested in for profit.

Turning to the relevant factors enumerated in section 1.183-2(b) of the regulations, we first conclude that HSL was operated in a businesslike manner. There is ample evidence in the record of the time, effort, and money expended by HSL and its investors. HSL investigated IDR and the software package prior to purchase, reviewing the contents of the proposal and contacting business associates in an attempt to determine IDR's credibility. Moreover, when it later became apparent that IDR would not fulfill its part of the bargain, HSL negotiated with other computer processors and ultimately hired its own programmer, Segale. In addition, HSL purchased its own computer at a cost of $71,404.96.

Another indication of the businesslike manner in which HSL conducted its activities was the continuous and active involvement of the investors in the progress of HSL and the software package. Board meetings were held regularly, and at all meetings, petitioner and Shumway were there or had a representative present. Moreover, HSL did not accept the agreement as offered by IDR without asserting its interests and did not sit passively while IDR failed to fulfill its part of the contract.

Respondent contends, however, that petitioner and Shumway cannot show a pattern of activity based on the activities of others, citing *Beck v. Commissioner, supra.* In *Beck*, we held that the taxpayers could not satisfy their

burden of proving business purpose and profit objective simply by pointing to activities contracted for through the shelter promoter. In *Beck,* however, we also recognized "that a prospective investor might seek and rely upon the advice of one possessing greater expertise in evaluating the economic merits of an investment." *Beck v. Commissioner, supra* at 571. In *Beck,* the taxpayers' tax advisor possessed no expertise in the recommended area of investment, and we commented that it was "improbable that [the taxpayer or his advisor], both of whom were inexperienced [in the industry in which they invested], would have blindly relied upon an appraisal furnished by the seller, if they had given any serious consideration to the nontax investment merits * * * , particularly in light of the business risks detailed in the offering memorandum." *Beck v. Commissioner, supra* at 572. The facts in *Beck* are simply not analogous to the facts of this case. Petitioners relied upon their advisors Harris, Spindelman, Mahoney, and Schacht, not blindly, but as experienced professionals with a long history of involvement with the nursing home industry. Schacht and Spindelman genuinely believed that the software would revolutionize the nursing home industry by simplifying compliance with the State reporting requirements. This is supported by the fact that they, themselves, invested in HSL.

In *Beck,* moreover, the taxpayer sought no information other than with respect to the tax consequences. While the petitioners in this case were aware of the tax benefits of their investment in HSL, they were able, by close contact with Harris, Mahoney, Spindelman, and Schacht, to possess additional information on the software. Petitioners thought they were getting an "in" on a future profit-making endeavor.

We next consider the expertise of the persons associated with HSL. The parties have stipulated that they had no working knowledge of either computer software or transactions involving them, or in computer design, operations, or marketing. The facts further indicate that at the time HSL was formed, none of the parties were involved with the computer business, either with programming or distribution. Many of the investors and advisors in this transaction,

however, had experience in the nursing home field. Spindelman represented at least 19 nursing homes in the Rochester area and was familiar with the State Medicaid requirements. Schacht was also involved in accounting for nursing homes and had five nursing home operators as clients. Shumway, during the years he was retired, owned a domiciliary care facility known as Mariner House. Phillipone, Harris, and Erdle also had business with nursing homes inside and outside New York. Thus, while no HSL investor had experience in the computer business, a majority of the HSL investors had significant experience in the nursing home industry sufficient to comprehend, monitor, and market the crucial feature of the software, the implementation of Peat Marwick recommendations. Moreover, HSL retained John Mazur, a computer programmer with an impressive educational background, to test the software, and Segale, to program it. For these reasons, we conclude that petitioner's and Shumway's lack of experience in the computer industry is offset by the overall expertise of the investors and their advisors in the nursing home field.

The next factor significant in our inquiry is the time and effort expended by the taxpayer in carrying on the activity. It has been stipulated that neither petitioner nor Shumway ever considered their investment for more than 1 hour on any occasion during the 4-year period encompassing 1978 through 1981, inclusive. The record, however, clearly points out that Harris, Mahoney, Spindelman, and Schacht, as their representatives, and on their own behalf, spent a great deal of time contemplating the investment, as they fully anticipated that the software would resolve a crucial need of the nursing home industry and develop into a viable business. The testimony of Spindelman and Schacht outlined how HSL continued to expend substantial amounts of energy and cash into the business even after they discovered that the software did not live up to the specifications as originally represented to them. We found their testimony to be straightforward and honest. Although, as respondent contends, the overall expectation of profit may not have been as reasonable in 1980 or 1981, given the introduction of comparable software to the market by HSL's competition, this does not make HSL's attempts to market the software

less viable, and this has no bearing on HSL's profit objective or lack thereof.

We conclude that HSL was an investment entered into for profit. The facts indicate that the HSL investors intended and worked hard to realize a profit in the years at issue, and we find that HSL was both organized and operated with the objective of producing a profit from the software purchased. Accordingly, petitioner and Shumway are entitled to otherwise allowable tax benefits arising out of such activity.

## 2. Investment Tax Credit

Pursuant to section 46(a) of the Code, petitioner and Shumway each claimed a 10-percent investment tax credit for the software as a qualified investment. The issue of whether computer software is tangible personal property or other tangible property eligible for the investment tax credit or intangible personal property not eligible for the ITC is one of first impression. Neither the Internal Revenue Code nor the regulations .provide much guidance for the resolution of this issue where the property contains both tangible and intangible qualities. Section 38(b)(1) of the Code provides for a credit for qualified investments in section 38 property in the first year the property is placed in service. Section 38 property is defined in section 48 of the Code as "tangible personal property" or "other tangible property." The income tax regulations are equally undescriptive. Income Tax Regulations section 1.48-1(c) categorizes tangible personal property as any tangible property, except land and improvements thereto, such as buildings and other inherently permanent structures. Income Tax Regs. section 1.48-1(f) defines intangible property which does not qualify as section 38 property as property such as patents, copyrights and subscription lists. The cost of intangible property includes the costs of purchasing or producing the item patented or copyrighted. Section 46(a) provides the amount of such credit which applies to the cost of qualifed investments.

Computer software has both tangible and intangible characteristics. The tangible components of the software include the medium upon which the software exists, such as

the original tapes and computer disks. Its intangible aspects include any information stored on the tangible disk or tape, i.e., the computer program.[6]

Respondent contends that HSL's computer software is intangible personal property not eligible for the ITC. In essence, respondent argues that even though the computer disk or tape is tangible personal property, the information stored on the disk is clearly intangible.

Petitioner urges us to conclude that computer software resembles tangible personal property and is eligible for the ITC. Petitioner would have us rely on a series of cases which began in the Ninth Circuit and held that certain motion pictures, tapes, and master sound recordings were tangible personal property eligible for the ITC and depreciation. See *Emi North America Holdings, Inc. v. United States,* 675 F.2d 1068 (9th Cir. 1982); *Bing Crosby Productions, Inc. v. United States,* 588 F.2d 1293 (9th Cir. 1979); *Walt Disney Productions v. United States (Disney II),* 549 F.2d 576 (9th Cir. 1976); *Walt Disney Productions v. United States (Disney I),* 480 F.2d 66 (9th Cir. 1973), cert. denied 415 U.S. 934 (1974). The *Disney* cases upheld the taxpayer's claim that motion picture master negatives used to make movie prints were property of a tangible nature and thus allowed the intangible costs taxpayer incurred in the production of these negatives to be included in the basis of the negatives, and the investment tax credit to be taken against the total capitalized cost. In *Disney II,* the court found a similarity between the master negative prints and the standard

---

[6]See Davidson, "Common Law, Uncommon Software," 47 U. Pitt. L. Rev. 1037, 1064-1065 (1986). Davidson comments that:

"The key to the paradigm shift is to treat software as unique. It appears to have a dual nature. Software has tangible and intangible aspects. Indeed, it seems to have a chameleon nature, undergoing a transition from a tangible to an intangible and back to a tangible object depending upon how it is used or how it is being viewed.

"While software must be tangible to be used by a computer, the particular tangible object on which it resides continually changes. It may be on coding paper. It may be transferred to computer memory. It may then be transferred to external storage, such as floppy disk. It may be moved from one computer to another, and placed inside of the internal memory of the new computer. From there it may be stored on an external fixed disk drive. It may also be down-loaded from one computer to another by electronic data transmission.

"In all these circumstances, software never remains static. It is not moved in one piece, but bit by bit, moving in and out of various parts of the computer. It is stored and restored in different parts of the memory systems of a computer, but not necessarily in the same place every time. Although it always must have a tangible residence, it need not have the same residence or even a contiguous one. Software shares this puzzling nature with other moveable information, including magnetically, optically and mechanically stored information."

articles of tangible business capital generally eligible for the ITC:

The master negatives for each film title were used by Disney as a capital asset to create exhibition prints for rental or sale * * * . A machine which stamps out patented products for sale is tangible * * * even if the value of the entire system is dependent on the patent, i.e., an intangible. [*Walt Disney Productions v. United States,* 549 F.2d at 581.]

Subsequently, Congress enacted section 48(k) which made the ITC available for certain new motion picture, television, and educational films. See H. Rept. 94-658, at 188 (1975), 1976-3 C.B. (Vol. 2) 695, 880. Under this section, films of a topical nature, such as interview shows, news shows, or sports events did not qualify for ITC. Moreover, section 48(k) did not extend the ITC to any other properties which were intangible in nature.

We do not find that the *Disney* cases or section 48(k) support petitioners' assertion that the computer software is tangible personal property.[7] Unlike the master negatives in *Disney,* HSL's software was not a "capital asset" used to create copies. In fact, HSL was not in possession of the master tape. Furthermore, both the *Disney I* and *Disney II* decisions were influenced by the subsequent section 48(k) legislation. The legislative history of section 48(k) was available for the court to review prior to its enactment, and it interpreted the history as directly relevant to a determination of this issue. Congress has to date, however, been silent on the subject of whether computer software should be eligible for the ITC. Even if the general reasoning articulated in the legislative history of 48(k) were relevant

---

[7]While we agree with respondent that *Disney* is not applicable in the instant cases, we disagree with respondent's basis for this assertion. Respondent argues that this Court rejected the *Disney* argument in *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223 (1975). In that case, we determined that files containing credit information were intangible property which should be depreciated by a straight-line method for purposes of sec. 167. In a footnote we noted that the taxpayers' argument that the files were tangible personal property under the *Disney* rationale was not persuasive, and we commented that:

"While we need not consider this argument, *Estate of Dorothy E. Beck,* 56 T.C. 297, 347 (1971), we think it lacks merit. The essence of the asset acquired by petitioners was the credit information contained in the files, not the files as such, and that information was obviously intangible property. * * * [64 T.C. at 238 n. 16.]"

While *Computing* contains the only published comment by this Court on the subject, its precedential value, in light of the fact that this Court did not consider the argument, is limited.

for computer software purposes, we decline to decide upon that which Congress has not.

Petitioners' more persuasive argument is their comparison of HSL's computer software to the seismic photographs found eligible for the ITC in *Texas Instruments, Inc. v. United States,* 551 F.2d 599 (5th Cir. 1977), affg. in part and revg. in part 407 F. Supp. 1326 (N.D. Tex. 1976). In *Texas Instruments,* the taxpayer's subsidiary, a geological survey firm, used magnetic computer tape and analog film to produce photographs of the earth's subterrain for sale to customers who in turn used the information on the photographs for oil and gas exploration purposes. *Texas Instruments, Inc. v. United States,* 407 F. Supp. at 1338. The data on the photographs were licensed to customers on a "non-exclusive" basis pursuant to written contract.

The Internal Revenue Service took the position that the investment was in the cost of the intangible, the seismic data, and not in the tangible films and tapes. The Fifth Circuit interpreted the Internal Revenue Service's argument to suggest "that property is intangible if its intrinsic value is attributable to its intangible elements rather than to any of its specific tangible embodiments." *Texas Instruments v. United States,* 551 F.2d at 609. Based on this "intrisic value" test, the court held that the taxpayer's investment in the information was an investment in tangible property because "the value of the seismic data was totally dependent upon the existence of the tapes and films. If the tapes and film were destroyed prior to any reproduction, nothing would remain. An investment in the data simply does not exist without recording of the data on tangible property." *Texas Instruments v. United States, supra* at 611. In looking at the property's "intrinsic value," the court found that the information placed on the tangible disks and tapes was tangible personal property because the seismic data did not exist as property separate from the physical manifestation. *Texas Instruments, Inc. v. United States, supra* at 611. Thus, the entire cost to the taxpayer of producing the tapes and films was included in the basis upon which the ITC was allowed. We apply the "intrinsic value" test adopted by *Texas Instruments* to the facts of this case to conclude that the intrinsic value of the HSL software is

attributable to its intangible elements rather than to its tangible embodiments.

Based on the foregoing, we find that HSL's computer software is intangible and not eligible for ITC.[8]

### 3. The Year the Software Was Placed in Service

Having determined that the software is not tangible personal property or other tangible property eligible for the ITC, we need not decide the year the software was initially placed in service by HSL for purposes of the ITC.

### 4. HSL's Basis in the Software

It is also not necessary for us to determine HSL's basis in the software for purposes of the ITC, as the software is not section 38 tangible personal property or other tangible property eligible for the ITC. However, in order to determine the section 6621(c) additional interest, we find HSL's basis in the software to be $515,450, comprised of the $295,000 cash investment and the two recourse notes in the amounts of $155,000 and $65,450. HSL's investment to this extent is a true investment. HSL's activities were activities engaged

---

[8]We are cognizant of the fact that for purposes of characterizing computer software, several scholars advocate classification approaches different from the traditional tangible or intangible legal analysis. For example:

"The paradigm shift to categorize the strange nature of moveable information is as follows: Law is a conservative doctrine and has barely moved into the Newtonian age of scientific understanding. Perhaps now is the time for it to move into the era of Quantum Mechanics. The ontological problems of software are similar to the problems faced early in the century by physicists studying the behavior of light and of electrons, protons, and other particles. At times, these particles exhibit the characteristics of hard objects; at other times, they exhibit the characteristics of waves spread over an area of space-time. This is puzzling only if one remains in a classical world. In a quantum world, these items are what they are. They are neither particles nor waves. They are something too new to be part of our intuitive training, and therefore difficult to appreciate.

"Software should be treated the same way. Consider it neither tangible nor intangible, but something else. Since the 'something else' must always have a tangible residence, it could be considered a 'good' under the UCC. Since this 'something else' can be quantified, it could also be considered tangible for tax purposes, especially in the context of commercial transactions and R&D efforts. In this way, software can be fit into our legal system. The legal system will simply have to adjust on a functional level, rather than trying to fit software into tangible or intangible categories on a formalistic level."

See Davidson, "Common Law, Uncommon Software," *supra* at 1064. See also note, "Computer Software and Tax Policy," 84 Colum. L. Rev. 1992, 2015-2024 (1984). (Provides a proposal for a two-tier property classification divided into productive property and consumption property for purposes of characterizing a given software transaction.)

Absent specific legislative authority, it is not for this Court to determine if either of these approaches or any other approach is better suited to properly characterize computer software for ITC or depreciation purposes.

in for profit within the meaning of section 183 and had economic substance.

We find, however, that the nonrecourse note is too speculative to be included in the basis of the software. See *Estate of Baron v. Commissioner,* 83 T.C. 542, 549 (1984), affd. 798 F.2d 65 (2d Cir. 1986). In *Baron,* we found a nonrecourse note too contingent where "the rights had no value apart from the income stream which might be generated * * * and the * * * stream was totally dependent upon public acceptance." Similarly, HSL's income stream from the distribution of the software, for purposes of paying off the large nonrecourse note, was almost totally dependent upon the implementation of the Peat Marwick recommendations and upon the nursing home industry's interest in such a package. We conclude, therefore, that possible profits from the software's commercial success or lack thereof in a narrow market is insufficient to support the nonrecourse note, and no portion of the $3,244,050 nonrecourse note can be included in basis.[9]

## 5. Section 6621(c)

Finally, we address the issue of whether petitioner and Shumway are liable for additional interest under section 6621(c). Tax Reform Act of 1986 (formerly sec. 6621(d)). Section 6621(c) provides for an increase in the interest rate if there is a substantial underpayment of at least $1,000 in any taxable year "attributable to one or more tax moti-vated transactions." Sec. 6621(c)(1) and (2). The additional interest applies to tax-motivated transactions, including "any valuation overstatement" within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Pursuant to section 6659(c), a valuation overstatement exists if the value of the property, or the adjusted basis of the property, claimed on a return "is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)."

On their respective returns, petitioner and Shumway each advanced a value of $3,759,500 for an asset which we have determined to be valued at $515,450 for depreciation

---

[9]It is therefore not necessary for us to consider either petitioner's or respondent's expert witnesses' appraisals for purposes of valuing the computer software package.

purposes. This is more than a 150-percent valuation overstatement. Respondent is entitled to impose a greater interest rate on the interest which accrued after December 31, 1984, on that part of the deficiencies attributable to tax-motivated transactions. Sec. 6621(c). See, e.g., *Zirker v. Commissioner*, 87 T.C. 970, 981 (1986).

## 6. IMTI Business Expenses

This particular issue is unique to petitioner Ronnen, and involves a Schedule C business deduction of a net operating loss on her 1978 income tax return attributable to IMTI in the amount of $36,238. The sole issue is whether petitioner may deduct the net loss of $36,238 against other income.

Petitioner has the burden of proof as to both the deductibility and substantiation of her claimed business expenses. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Based on the lack of evidence to support petitioner's deductions, we find that she has failed to carry her burden of proof with respect to all claimed IMTI expenses.

Petitioner acknowledges that she is unable to secure any related business documentation or records of her expenses but urges us, nevertheless, to find for her based on *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). In *Cohan*, the Court of Appeals found as a fact that the taxpayer had paid certain travel and entertainment expenses and allowed him to take certain deductions even though he could not substantiate them. The court, in commenting on this absence of proof, noted:

Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent. [39 F.2d at 543-544.]

In the instant case, we are unable to find as a fact that petitioner paid any of the business or travel and entertainment expenses that she claims are related to IMTI. Petitioner introduced no evidence, either documentary or by testimony, that would support her stance. The only item offered in support of her deductions is a memorandum

which contains a list of claimed expenditures dated April 19, 1978, totaling $10,867.03. This document, however, is merely self-serving and provides no tangible evidence of incurred expenses. Moreover, Schacht's testimony on petitioner's behalf provided no additional support of petitioner's claims. We decline, therefore, to apply the *Cohan* rule on this record. See *Stemkowski v. Commissioner*, 82 T.C. 854, 867 (1984); *Epp v. Commissioner*, 78 T.C. 801, 807 (1982).

*Decisions will be entered under Rule 155.*