LINDA JOY JACKSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jackson v. Commissioner
Docket No. 13642-87
United States Tax Court
T.C. Memo 1990-520; 1990 Tax Ct. Memo LEXIS 573; 60 T.C.M. (CCH) 927; T.C.M. (RIA) 90520; September 27, 1990, Filed *573 Decision will be entered under Rule 155. John J. Borsos, for the petitioner. Mark H. Howard, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's and her husband, Thomas C. Jackson's, joint Federal income tax, additional interest, and additions to tax, as follows: Interest and Additions to Tax, I.R.C. Secs. [1]
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6659
1981
$ 7,957 *
$ 398 **
$ 2,326
1982
2,292 *
115 **
584
1983
3,729 *
186 **
1,119
*575 After settlement of some issues, the primary issue for decision is whether respondent properly disallowed expenses and an investment tax credit relating to a cattle investment. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner resided in Hiawatha, Utah, at the time she filed her petition in this case. In 1981, petitioner worked as an insurance clerk for Sharon Steel Corporation in Salt Lake City, Utah, and her husband worked as an underground mining supervisor in a mine located near Helper, Utah. In 1981, petitioner earned $ 14,559 in wages and Mr. Jackson earned $ 38,690 in wages for a total combined wage income of $ 53,249. Petitioner and her husband had minimal nonwage income and no substantial assets. They were having financial and marital difficulties. Petitioner had one child, and by early 1982 she was expecting a second child. Mr. Jackson had a severe drinking problem that jeopardized the marriage and his job. In spite of their relatively modest income, relatively low tax bracket, and financial difficulties, in late 1981 petitioner and Mr. Jackson discussed purchasing an interest in Blonde d'Aquitaine cattle, offered for sale *576 and breeding by Eureka Livestock, Ltd. ("Eureka Livestock"). The investment was offered to petitioner and her husband as a significant tax shelter. It was represented that much of the initial cash to be paid by petitioner and her husband could be funded from the tax refund expected to be produced from the investment. Originally bred in southwestern France, Blonde d'Aquitaine cattle are prized because of their bone structure, size, ease of calving, and high dressing percentage. The first Blonde d'Aquitaine cattle were brought into the United States in the early 1970's. In 1974, a Mr. Gale Critchfield and his associates purchased a purebred Blonde d'Aquitaine bull for $ 38,500 at an auction in Calgary, Canada. In March of 1975, Sterling Transplants, Inc. ("Sterling Transplants"), a company founded and controlled by Gale Critchfield, purchased three purebred Blonde d'Aquitaine cows that were imported from England for $ 30,000 each. By 1976, however, Gale Critchfield or Sterling Transplants was able to purchase 10 purebred Blonde d'Aquitaine cows for only $ 3,000 each. The 10 additional cows were of a quality substantially similar to the three cows purchased in 1975. In the *577 late 1970's and early 1980's, Critchfield and his associates and controlled corporations bred Blonde d'Aquitaine cows utilizing an embryo transfer procedure under which the cows' reproductive tracts would be stimulated with hormones inducing the formation in the ovary of more than one ovum at a time. The cows would then be artificially inseminated with the semen of a Blonde d'Aquitaine bull. After the embryos had formed and developed for approximately a week within the cows, the embryos would be flushed from the cows and implanted, one each, in host cows that were not Blonde d'Aquitaine cows. The calves produced would bear the genes of the Blonde d'Aquitaine bulls and cows, and the breed of the host cows into which the embryos were implanted would have no genetic bearing on the characteristics of the calves produced. In late 1981, Ross Critchfield, a brother of Gale Critchfield and one of the owners of Eureka Livestock, discussed an investment in Blonde d'Aquitaine cattle with petitioner and Mr. Jackson. Neither Mr. Jackson nor petitioner had any experience raising or breeding cattle, nor did they subscribe to any publications concerning the cattle industry. Mr. Jackson conferred *578 with the promoters, with their neighbors, and with others who had invested in the tax shelter. Petitioner and her husband discussed the investment, but petitioner was skeptical of its profitability and advised against the investment. On December 12, 1981, however, with petitioner's knowledge, Thomas Jackson entered into an agreement to purchase from Eureka Livestock one Blonde d'Aquitaine cow and to engage Alamo Embryo Transfer, Inc. ("Alamo") to perform five embryo transplants on the cow. Although neither Thomas Jackson nor petitioner signed written agreements, the record contains substantial evidence indicating that Thomas Jackson did in fact agree to purchase the cow. For the purchase of the cow, Mr. Jackson agreed to pay $ 21,905, to be reflected by a "down payment" promissory note of $ 6,905 and another promissory note of $ 15,000. Eureka Livestock was to retain the title or registration documents on the cow and a security interest in any offspring or transplanted embryos from the cow until Mr. Jackson's promissory notes were paid in full. For Alamo's embryo transplant services, Mr. Jackson agreed to pay Alamo $ 10,500. Alamo retained a security interest in the cow and *579 any calves and any transplanted embryos produced therefrom until Mr. Jackson paid the full $ 10,500 for the embryo transplant services. In 1985, the estimated fair market value or cost of embryo transplant services was $ 500 per transplant. Petitioner and Mr. Jackson delivered checks to Eureka Livestock in the amounts of $ 6,905, $ 2,500, $ 403, and $ 870, in partial payment of the promissory notes owed to Eureka Livestock. Petitioner alone signed the check to Eureka Livestock in the amount of $ 6,905. The record does not reflect that any payments were made on the $ 10,500 owed to Alamo in connection with the embryo transplant services. Neither petitioner nor Mr. Jackson ever saw or took possession of the cow purchased. Eureka Livestock boarded and cared for the cow. In 1983, due to the Jacksons' delinquency in paying feed bills relating to the cow, Eureka Livestock reclaimed ownership of the cow. Alamo performed embryo transplant services on the cow, and five calves were produced. Because it was never paid for its services, however, Alamo retained possession of the five calves. Neither petitioner nor Mr. Jackson maintained any books or records with respect to the purchase *580 and ownership of the cow. Petitioner's and Mr. Jackson's Federal income tax returns for 1981, 1982, and 1983 were prepared on the cash method of accounting. On Schedule F attached to their joint Federal income tax return for 1981, petitioner and Mr. Jackson claimed deductions and reported a net loss with respect to the Blonde d'Aquitaine cow as follows: Deduction
Amount
Breeding Fees
$    500
Insurance
600
Freight, Trucking
750
Embryo Transfer Fees
10,500
Membership Fees
53
Depreciation
3,150
Total deductions
15,553
Net Loss
$ 15,553
The depreciation deduction was computed and an investment tax credit of $ 2,100 also was claimed with respect to the Blonde d'Aquitaine cow based on a claimed adjusted basis in the cow of $ 21,000. Petitioner's and Mr. Jackson's 1981 tax return was prepared by a tax return preparer and signed by petitioner. Although it was petitioner's and Mr. Jackson's understanding that they were filing a joint return for 1981, Thomas Jackson did not sign the 1981 return, presumably because of various personal problems reflected in the record. Mr. Jackson's wage income for 1981 was included in the return. On October 31, 1984, both *581 petitioner and Mr. Jackson signed a Form 872A Special Consent To Extend The Time To Assess Tax for 1981. On Schedule F attached to petitioner's and Mr. Jackson's joint Federal income tax return for 1982, petitioner and Mr. Jackson claimed deductions and reported a net loss with respect to the Blonde d'Aquitaine cow as follows: Deduction
Amount
Interest
$   870
Feed Purchased
403
Depreciation
4,620
Total Deductions
5,893
Net Loss
$ 5,893
On audit, respondent disallowed the deductions claimed by petitioner and Mr. Jackson for 1981 and 1982, and respondent disallowed the investment tax credit claimed for 1981 relating to the Blonde d'Aquitaine cow. Respondent alternatively determined for 1983 that petitioner and Mr. Jackson had unreported income from discharge of indebtedness in the amount of $ 15,000 due to the return of the cow to Eureka Livestock and the alleged discharge of the debt obligations associated therewith. OPINION Deductions and Investment Tax Credit
In order to be allowable, the deductions and investment tax credit at issue in this case must be supported by an actual and honest profit objective. Levy v. Commissioner, 91 T.C. 838, 871 (1988); *582 Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985); Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Stahl v. Commissioner, T.C. Memo. 1990-320. Factors relevant in determining whether an activity is engaged in for profit are set out in section 1.183-2(b), Income Tax Regs.[2]
*583 The following factors establish that the investment was not entered into with an actual profit objective. Neither petitioner nor Mr. Jackson conducted a good faith investigation into the viability of the potential investment. Some of the important documents relating to the investment were not signed by petitioner or by Mr. Jackson. Petitioner and Mr. Jackson never saw the cow. They did not take possession of the cow, and they were not prepared to take possession of the cow. Neither petitioner nor Mr. Jackson had any experience in raising and breeding cattle. Neither petitioner nor Mr. Jackson kept books and records with respect to the cow. In addition, credible evidence in this case is sparse as to the fair market value in 1981 of a Blonde d'Aquitaine cow and of embryo transplant services. As indicated, Eureka Livestock in 1976 purchased a number of purebred Blonde d'Aquitaine cows at a price of $ 3,000 per cow, and the stated cost in 1985 of a single embryo transplant was $ 500. We conclude that this evidence is the best indication of the fair market value of the cow Mr. Jackson purchased in 1981 for a stated price of $ 21,000 and the best indication of the fair market value *584 of the embryo transplant services Mr. Jackson purchased in 1981 for a stated purchase price of $ 10,000. We hold that the fair market value in 1981 of the Blonde d'Aquitaine cow Mr. Jackson purchased was $ 3,000, and the fair market value of the five embryo transplant services was $ 2,500. The inflated stated purchase price for the cow and for Alamo's embryo transplant services is strong evidence of the lack of profit objective associated with the investment. In spite of petitioner's and Mr. Jackson's relatively modest income and low tax bracket, tax benefits appear to have been the reason for the investment. We conclude that the purchase by Mr. Jackson of the Blonde d'Aquitaine cow was not entered into with an actual and honest profit objective. The deductions and credit at issue are allowed only to the extent permitted by section 183(b). The deductions claimed for embryo transplant services also are disallowed for failure to substantiate that any such fees were paid, as is the claimed interest expense for 1982 of $ 870. Sec. 1.461-1(a), Income Tax Regs.
In light of our resolution of the issues with respect to 1981 and 1982 in favor of respondent, *585 respondent's alternative adjustment for 1983 is moot and is therefore not sustained. [3]
Additions to Tax and Increased Interest
Respondent determined additions to tax for underpayments due to negligence or intentional disregard of rules and regulations under sections 6653(a)(1) and (2) for each of the years in issue. Under section 6653(a), negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *586 Petitioner bears the burden of proving that her underpayments were not due to negligence. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). Our findings of fact as set forth above establish petitioner's liability for the additions to tax for negligence under section 6653(a)(1) and (2) for 1981 and 1982. We so hold. Respondent also determined increased interest and additions to tax for valuation overstatements under sections 6621(c) and 6659. Where a determination that a taxpayer is not entitled to claimed deductions and credits is made without regard to any claim of basis or without findings with respect to fair market value, increased interest under section 6621(c) and additions to tax under section 6659 may be inapplicable because the resulting underpayment of tax may be attributable solely to the disallowed deductions and credits, not to a valuation overstatement. Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990), revg. a Memorandum Opinion of this Court; Todd v. Commissioner, 862 F.2d 540, 542-543 (5th Cir. 1988), affg. 89 TC. 912 (1987); McCrary v. Commissioner, 92 T.C. at 827, 854 (1989). *587 In this case, the deductions and investment tax credit were disallowed because of the lack of an actual and honest profit objective associated with the investment. However, the valuation overstatements regarding the purchase price of the cow and the embryo transplant services were integral to and inseparable from our disallowance of the deductions and investment tax credit under the profit objective test. Further, with regard to the increased interest under section 6621(c), section 301.6621-2T, Temporary Administrative and Procedural Regs., Q & A - 4, 49 Fed. Reg. 50392 (Dec. 28, 1984) provides that claimed deductions that are determined to be unallowable under section 183 are to be considered attributable to tax motivated transactions. Under these circumstances, the additional interest and additions to tax under sections 6621(c) and 6659 are applicable and are appropriately applied to the full amount of the tax underpayments for 1981 and 1982. See Gainer v. Commissioner, 893 F.2d 225, 228 (9th Cir. 1990), affg. a Memorandum Opinion of this Court; Irom v. Commissioner, 866 F.2d 545, 547-548 (2d Cir. 1989), vacating and remanding *588 T.C. Memo. 1988-211; McCrary v. Commissioner, 92 T.C. 827, 859 (1989). Joint Return and Innocent Spouse
Petitioner argues that the 1981 tax return was not a joint return because it was not signed by Mr. Jackson. Petitioner therefore argues that all of Mr. Jackson's separate income and all deductions and credits relating to his separate investments (including those relating to the cattle investment) should be deleted from the return and her tax liability should be computed separately. As we have held, the 1981 tax return was filed as a joint return. It included Mr. Jackson's wage income. It was prepared by a tax return preparer and signed by petitioner as a joint return. Mr. Jackson did not file a separate return for 1981. There is no basis for treating the return as a separate return of petitioner. We so hold. Petitioner's last argument is that she is eligible for relief as an innocent spouse under section 6013(e) with respect to the tax deficiencies, additions to interest, and additions to tax associated with the cattle investment. Petitioner's participation in the discussions that led to the investment, her payment of $ 6,905 *589 to Eureka Livestock in connection with the investment with a check that she alone signed, and her decision to sign the tax returns even though she questioned the soundness of the investment establish petitioner's ineligibility for relief as an innocent spouse. Sec. 6013(e)(1)(C) and (D). In our discretion, we also deny respondent's motion for an award of damages (now called a penalty) under section 6673. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * Additional interest under section 6621(c) was determined on underpayments of tax in the amounts of $ 7,957, $ 2,105, and $ 3,729 for 1981, 1982, and 1983, respectively. ** Additional interest under section 6653(a)(2) was determined on underpayments of tax in the amounts of $ 7,752, $ 1,946, and $ 3,729 for 1981, 1982, and 1983, respectively.↩
2. Sec. 1.183-2(b), Income Tax Regs., lists some of the factors relevant in determining whether an activity is engaged in for profit as follows: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) The financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation. * * *↩
3. We also note that petitioner and Mr. Jackson forfeited the Blonde d'Aquitaine cow and the five calves in 1983 as a result of their default on the obligations due Eureka Livestock and Alamo. This transaction would not appear to produce discharge of indebtedness income but would be regarded as a payment on the debt obligations. Further, there is no evidence that petitioner and Mr. Jackson have been relieved of the outstanding balances due on their debt obligations associated with this transaction.↩