T.C. Memo. 2000-356

UNITED STATES TAX COURT

ROBERT AND JOYCE DIRKSE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13985-98.                    Filed November 15, 2000.

<u>Gerald W. Kelly, Jr.</u>, for petitioners.

<u>Nicholas J. Richards</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>: Respondent determined deficiencies and accuracy-related penalties under section 6662(a) with respect to petitioners' Federal income taxes, as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 1995 | $29,719 | $5,944 |
| 1996 | 32,687 | 6,537 |

These deficiencies stem from respondent's determination that petitioners' apiary, tree-farming, and rental activities (hereinafter, collectively referred to as petitioners' Schedule C activities) conducted during 1995 and 1996 (the years in issue) were not activities engaged in for profit, resulting in the disallowance of claimed losses attributable to these activities.

The issues for decision are: (1) Whether petitioners' Schedule C activities were engaged in for profit; and (2) whether petitioners are liable for the section 6662(a) accuracy-related penalties.

All section references are to the Internal Revenue Code as in effect for the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference.

Background

Petitioners, husband and wife, resided in Corona, California, on the date they filed their petition contesting respondent's determinations. For each of the years in issue, petitioners electronically filed joint Federal income tax returns; included as a part of these returns were separate schedules for each of petitioners' Schedule C activities. These returns were prepared by a paid return preparer, employed by H & R Block.

Robert Dirkse (petitioner) was raised in a small farming community in Wisconsin. During his teenage years, petitioner worked on his grandfather's farm, assisting his family in planting and growing vegetables and flowers.

For most of his professional career, petitioner was employed as a public school teacher, at the high-school level, teaching biology, chemistry, and general science courses. Petitioner subsequently became a school principal, at the elementary-school level, and during the years in issue, he was a supervisor at the Adult School.

Prior to and during the years at issue, Joyce Dirkse (Mrs. Dirkse) was employed as a registered nurse.

Petitioners' Apiary Activities

In the early 1980's, petitioner became interested in beekeeping as a consequence of teaching a science class for gifted students. In 1981, petitioners acquired a swarm of bees from the father of one of petitioner's students and purchased apiary (beekeeping) equipment and clothing. Petitioners thereafter joined the local beekeeping society.

Initially, petitioners raised their bees in hives located on someone else's property. In 1983, petitioners acquired a 10-acre tract of land in Corona, California (the Corona property), where they moved their beehives and worked them. (Corona is approximately 50 miles from Cerritos where petitioners then

resided.) Petitioners then moved their beehives to Cerritos, but in 1985, petitioners relocated their beehives back to the Corona property in response to neighbors' complaints.

Petitioners' apiary activities never generated a profit. The following chart sets forth the revenues and expenses from petitioners' apiary activities between 1992 and 1996:

| Year | Revenue | Expenses |
|------|---------|----------|
| 1992 | $265 | $26,153 |
| 1993 | 470 | 21,121 |
| 1994 | 0 | 18,112 |
| 1995 | 400 | 23,768 |
| 1996 | 945 | 16,739 |

The record does not reveal the revenue and expenses from petitioners' apiary activities prior to 1992.

Petitioners' Tree-Farming Activities--Rojo International

In 1983, while attending the Los Angeles County Fair, petitioners visited a booth manned by the California Macadamia Society (the Macadamia Society), and inquired as to the feasability of raising macadamia trees on their Corona property. They joined the Macadamia Society and attended meetings in order to learn about the care and cultivation of macadamia trees; petitioners hired the president of the Macadamia Society as a consultant. She made specific recommendations as to the type of macadamia trees that should be planted on petitioners' Corona property.

Relying upon these recommendations, in 1984, petitioners planted 300 ungrafted macadamia trees on their Corona property.

(Based upon their research, and consultation with members of the Macadamia Society, petitioners calculated that once the macadamia trees reached maturity (which took between 5 and 7 years), each tree would produce approximately 150 pounds of marketable nuts.) The advice petitioners received proved to be erroneous; many of the trees failed to fully develop during the first year. In order to restore their crop, petitioners planted new saplings using a technique that, in the prior year, petitioners' consultant had recommended against using.

In 1985, petitioners installed a gravity water irrigation system on the Corona property. Notwithstanding the installation of the irrigation system, the macadamia trees failed to produce the quantity of marketable nuts that petitioners expected. Moreover, in 1991 petitioners lost 50 of their trees due to frost damage. (Only a portion of the number of trees lost were ever replanted.)

As a hedge against the poor yields of macadamia nuts, petitioners decided to plant Fuyu persimmon trees on the Corona property. In 1986, petitioners planted 300 persimmon trees on a portion of the unused land at their Corona property.

Following a 3-year gestation period, the persimmon trees yielded a marketable crop of fruit. As the trees and crops grew, they required more attention. Petitioners hired a part-time laborer, Carlos Ramirez (Mr. Ramirez), in 1988. On several occasions, petitioners hired migrant workers to assist Mr. Ramirez.

The workers were paid on a per-project basis, performing such tasks as: Packaging and selling the nuts and fruit, watering and pruning the trees, and performing general maintenance around the Corona property. In addition to hiring these workers, petitioners improved the roads to provide easier access to the Corona property and installed 900 feet of fencing to prevent thieves from stealing their macadamia nut and persimmon produce.

Initially, petitioners attempted to sell their nut and fruit produce at the Fuyu co-op in Temecula, California; however, the co-op's quality standards prevented a substantial portion of petitioners' produce from being sold. In an attempt to increase revenues, Mr. Ramirez (on behalf of petitioners) began selling the macadamia nuts and persimmon fruit at roadside stands. However, this activity ceased after Mr. Ramirez was confronted by competing vendors and the local authorities regarding his lack of the required business licenses. Thereafter, petitioners derived most of their revenue through consigning their goods at swap meets. Unsold produce was often donated to charity.

During the years in issue, petitioner generally visited the Corona property three times a week. During weekday trips, he typically spent the night at the Corona property and returned to his full-time job the following morning. On weekends, petitioner usually stayed at least one night, and often he stayed until Sunday evening before returning home to Cerritos. Mrs. Dirkse often

accompanied petitioner on weekend visits. (Petitioners failed to maintain mileage logs for their trips to the Corona property.) While at the Corona property, petitioner often assisted in the harvesting and packing of the macadamia nuts and persimmon fruit.

Petitioners grouped their tree-farming activities (i.e., their macadamia nut and persimmon fruit operations, which they called "Rojo International") as a single Schedule C activity. The tree-farming activities never generated a profit. The following chart sets forth the revenues and expenses from petitioners' tree-farming activities between 1992 and 1996:

| Year | Revenue | Expenses |
|------|---------|----------|
| 1992 | $440 | $55,053 |
| 1993 | 490 | 61,280 |
| 1994 | 0 | 57,578 |
| 1995 | 1,900 | 68,336 |
| 1996 | 1,400 | 88,075 |

The record does not reveal the revenue and expenses from petitioners' tree-farming activities prior to 1992.

Rental Activity

Beginning in the early 1980's, petitioners were employed (on a part-time basis) as teacher/trainers for the Christian Reform Church (the church). Frequently, petitioners allowed church members to use the Corona property for religious retreats. Petitioners maintained six trailers on the Corona property. During the religious retreats, church members were housed in petitioners' trailers, for which petitioners received a nominal rental fee.

In 1992, petitioners disassociated themselves from the church and began renting the trailers to individuals seeking weekend getaways. Petitioners failed to obtain the requisite permits or business licenses for this activity.

Petitioners' rental activities (which for the years in issue, petitioners listed as a "consulting" activity) never generated a profit. The following chart sets forth the revenues and expenses from petitioners' rental activities between 1992 and 1996:

| Year | Revenues | Expenses |
|------|----------|----------|
| 1992 | $7,200 | $16,767 |
| 1993 | 1,225 | 11,810 |
| 1994 | 500 | 3,967 |
| 1995 | 1,200 | 13,041 |
| 1996 | 11,200 | 28,379 |

The record does not reveal the revenue and expenses from petitioners' rental activities prior to 1992.

Miscellaneous

During the years 1992-1996, the revenues from petitioners' Schedule C activities totaled $27,635; whereas, the claimed expenses from these activities totaled $484,374.

On their 1995 and 1996 Federal income tax returns, petitioners reported the following income and Schedule C losses:

| Year | Income | Schedule C Loss |
|------|--------|-----------------|
| 1995 | $174,761 | $102,845 |
| 1996 | 181,678 | 120,278 |

In 1995, the Internal Revenue Service audited petitioners' 1994 return and determined that no change thereto was required.

Petitioners did not maintain a business bank account during the years at issue; revenues and expenses for each of the Schedule C activities were channeled through their personal checking account.

Notice of Deficiency

In the notice of deficiency, respondent determined that petitioners' Schedule C activities were neither entered into for profit nor were the claimed expenses relating thereto substantiated. (Subsequently, respondent conceded that most of the claimed expenses were paid or incurred.) Consequently, respondent disallowed the deductions attributable to those activities for 1995 and 1996 ($102,845 and $120,278, respectively). Respondent alternatively determined that the losses from petitioners' Schedule C activities constituted passive activity losses that were subject to the deduction limitations of section 469. Moreover, respondent imposed section 6662(a) accuracy-related penalties for the years in issue.

OPINION

Schedule C Activities

The primary issue is one of fact: whether petitioners entered into or carried on all or any of their Schedule C activities with

an intent to make a profit.[1]  If petitioners did not have the requisite profit motive, as respondent maintains, then all deductions exceeding the revenue attributable to those activities would be disallowed pursuant to section 183(a).

Respondent contends that petitioners lacked the requisite intent to make a profit in carrying out their Schedule C activities.  Specifically, respondent asserts that petitioners (1) did not conduct their Schedule C activities in a businesslike manner, (2) never earned a profit from any of these activities and are unlikely to do so in the near future, and (3) realized substantial tax savings by offsetting the income from their primary occupations with their Schedule C losses.

On the other hand, petitioners maintain that they entered into and carried out their Schedule C activities with an intent of

---

[1]     For purposes of applying sec. 183, we treat all three of petitioners' Schedule C activities as a single activity.  In ascertaining what constitutes an activity or activities of a taxpayer, we take into account the facts and circumstances of each case.  See sec. 1.183-1(d), Income Tax Regs.  Generally, the most significant factors in making this determination are the degree of organizational and economic interrelationships of the various undertakings and the business purpose which is (or might be) served by carrying on the operations separately or in a trade or business setting.  See id.
In the case at bar, petitioners contend that they entered into each of their Schedule C activities with the intent of supplementing their retirement income.  All three activities were operated with the same business purpose, and each shared the resources and capital of the others; in sum, each Schedule C activity was organizationally and economically dependent upon the others.  On brief, petitioners treated all three of their Schedule C activities as one activity.

making a profit. Petitioners assert that they operated their Schedule C activities in a businesslike manner. Petitioners maintain that because the apiary and tree-farming activities were inherently high risk businesses that often require a lengthy startup period, their history of losses relating thereto was not uncommon. Accordingly, petitioners maintain that they were willing to incur substantial startup costs with the expectation that eventually their Schedule C activities would provide them with supplemental retirement income.

For the reasons set forth below, we agree with respondent and conclude for each of the years at issue, petitioners' Schedule C activities were not engaged in for profit.[2]

We begin our analysis with the applicable statutory provisions. Pursuant to section 183, deductions with respect to an activity "not engaged in for profit" generally are limited to the amount of gross income derived from such activity. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of

_____

[2] Because we find that petitioners' Schedule C activities were not engaged in or carried on for profit, we need not decide respondent's alternative position that petitioners' Schedule C losses were passive activity losses subject to the limitations imposed under sec. 469.

section 212." Accordingly, section 183 is considered in pari materia with sections 162 and 212. See sec. 1.183-2(a), Income Tax Regs.

The basic standard for determining whether an expense is deductible under sections 162 and 212 (and thus not subject to the limitations of section 183) is the following: a taxpayer must show that he or she engaged in or carried on the activity with an actual and honest objective of making a profit. See Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988); Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); sec. 1.183-2(a), Income Tax Regs. Although a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. See Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985).

While the focus of this test is on the subjective intent of the taxpayer, objective criteria may also be used. See Independent Elec. Supply, Inc. v. Commissioner, supra. Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in or carried on for profit. These factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the

taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation exist. No single factor is necessarily relevant or dispositive; rather, the facts and circumstances of the case ultimately control. See Keanini v. Commissioner, 94 T.C. 41, 47 (1990). Further, the determination of a taxpayer's profit motive is made on a yearly basis. See Commissioner v. Sunnen, 333 U.S. 591, 598 (1948).

We now apply each of these factors to the facts in this case.[3]

### 1. Manner of Carrying on the Activity

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(b)(1), Income Tax Regs. Adapting new techniques and abandoning methods that are economically inefficient may also support the

---

[3] The record does not reveal whether petitioners ever engaged in other similar or dissimilar activities. Thus, we find a discussion of petitioners' success in these activities to be nongermane.

conclusion that the taxpayer possessed the requisite profit motive. See Allen v. Commissioner 72 T.C. 28, 35 (1979).

Here, the record reveals numerous instances where petitioners did not conduct their Schedule C activities in a businesslike manner. Petitioners failed to acquire the necessary local business licenses to sell their produce, resulting in lost revenue. Petitioners did not maintain any formal business plans, budgets, ledgers, or other accounting records. In addition, they did not possess any mileage logs or formal records of payments made to their undocumented workers. (In this regard, petitioners were unable to substantiate some of their claimed deductions.[4]) Petitioners also failed to keep separate bank accounts; they intermingled their personal funds with those of their Schedule C activities and paid all expenses from this account. (Petitioner testified that he decided against using a separate business account because the bank charged a per check fee.)

Despite incurring losses over a number of years, there is no convincing evidence in the record indicating that petitioners undertook meaningful action to control or rectify the continual stream of losses arising from their Schedule C activities. Petitioners' losses increased during the 3 years between 1994 and

---

[4] For instance, petitioners claimed 89,159 miles on their 1995 return as the distance traveled in connection with their Schedule C activities; at trial, they conceded that the actual number of miles was approximately 15,600.

1996, from $79,157 in 1994 to $120,278 in 1996. In fact, petitioners acknowledged that they are unable to predict when, or if, their Schedule C activities will become profitable. Consequently, this factor weighs against a finding of a profit motive.

### 2. Expertise of Taxpayer or Advisers

Preparation for an activity after conducting an extensive study or consultation with experts regarding the accepted business practices of the activity may indicate a profit motive where the taxpayer conducts the activity in accordance with such study or advice. See sec. 1.183-2(b)(2), Income Tax Regs. Conversely, a taxpayer's failure to obtain expertise in the activity may indicate a lack of profit motive. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523.

Prior to entering into their Schedule C activities, petitioners consulted with and relied upon the advice of members of the macadamia and persimmon societies, as well as an experienced beekeeper. Moreover, they spent a considerable amount of time and effort researching their Schedule C activities. Indeed, when the advice of a paid consultant turned out to be incorrect, petitioners were able to identify the source of the problem and take remedial action.

The fact that petitioners consulted technical, noneconomic experts does not necessarily indicate that they carried on their

Schedule C activities for profit.  See <u>Hillman v. Commissioner</u>, T.C. Memo. 1999-255.  Considering all the years of substantial losses, petitioners did little to demonstrate an expertise for the economics of these operations.  Consequently, this factor weighs against a finding that petitioners' Schedule C activities were carried on with the intent to make a profit.  See <u>Kahla v. Commissioner</u>, T.C. Memo. 2000-127.

### 3.  Time and Effort Expended in the Activity

The fact that a taxpayer devotes much of his or her personal time and effort in carrying on an activity, particularly if the activity does not have substantial recreational aspects, may indicate a profit motive.  See sec. 1.183-2(b)(3), Income Tax Regs.

During the years at issue, petitioner traveled to their Corona property at least three times a week and often spent the weekends there accompanied by Mrs. Dirkse.  While on the property, petitioner spent significant periods of time supervising his laborers as well as assisting in the tree-farming and apiary activities.  In addition, petitioners conducted many of the retreat activities and managed the rental of their trailers.  Moreover, they often spent their free time learning about apiary and tree farming.  Consequently, this factor weighs in favor of finding a profit motive.

## 4. Expectation That Assets May Appreciate

An expectation that assets used in the activity will appreciate may indicate a profit objective. See sec. 1.183-2(b)(4), Income Tax Regs. Accordingly, a profit motive may be inferred even where there are no operating profits, so long as the appreciation in value of the activity's assets exceeds its operating expenses of the current year and its accumulated losses from prior years. See Golanty v. Commissioner, 72 T.C. 411, 427-428 (1979), affd. 647 F.2d 170 (9th Cir. 1981).

Petitioners purchased the Corona property in 1983 in order to relocate their apiary activity, not for speculative appreciation. Although petitioner testified regarding the appreciation of land in the vicinity of the Corona property, there is no credible evidence in the record as to the value of petitioners' property or that any appreciation in the assets used in petitioners' Schedule C activities will exceed the cumulative losses of their Schedule C activities. Consequently, this factor weighs against finding a profit motive.

## 5. History of Income or Losses From the Activity

A history of losses over an extended period of time may indicate the absence of a profit objective. See Allen v. Commissioner, 72 T.C. at 34. Although a long history of losses is an important criterion, it is not necessarily determinative. See Engdahl v. Commissioner, 72 T.C. at 669; Allen v. Commissioner,

<u>supra</u>.   For instance, a series of startup losses or losses sustained because of unforeseen circumstances beyond the taxpayer's control may not indicate a lack of profit motive.  See sec. 1.183-2(b)(6), Income Tax Regs.

No profits have ever been generated from petitioners' Schedule C activities, and none are expected in the near future. Petitioners have been conducting their Schedule C activities well beyond the length of time that can be reasonably called the "startup" period, and there is no evidence in the record indicating that their Schedule C losses are the result of unforeseen circumstances.   Rather, the extended period of losses is attributable to petitioners' unchecked expenditures and their failure to develop a suitable market for their produce.  Indeed, the growing disparity between petitioners' losses and revenue stream is indicative of an unprofitable undertaking and is inconsistent with petitioners' purported intent to provide supplemental income.  Consequently, this factor weighs against a finding of a profit motive.

### 6.  The Amount of Occasional Profits, Earned, If Any

If an activity generates only small, infrequent profits and typically generates large losses, the taxpayer conducting the activity may not have a profit objective.   See <u>Golanty v. Commissioner</u>, <u>supra</u> at 427; sec. 1.183-2(b)(7), Income Tax Regs.

As stated, petitioners have never made a profit from their Schedule C activities, and there is no indication from the record that petitioners can realistically expect profitability in the near future. Consequently, this factor weighs against a finding of a profit motive.

### 7. Taxpayer's Financial Status

Substantial income from sources other than the activity in question, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit. See Hillman v. Commissioner, supra; sec. 1.183-2(b)(8), Income Tax Regs.

For 1995 and 1996, petitioners had $174,761 and $181,678, respectively, in unrelated gross income. During the same years, they claimed $102,845 and $120,278, respectively, in Schedule C losses. Petitioners used these losses to reduce their gross income by 59 percent for 1995 and 66 percent for 1996. These reductions led to substantial tax savings for petitioners. Consequently, this factor weighs against a finding of a profit motive.

### 8. Elements of Personal Pleasure or Recreation

The existence of recreational elements in an activity may indicate that the activity is not engaged in for profit; on the other hand, where an activity lacks any appeal other than profit, a profit motive may be indicated. See Hillman v. Commissioner, supra; sec. 1.183-2(b)(9), Income Tax Regs.

Nothing in the record indicates that petitioners used the Corona property or their Schedule C activities to derive personal pleasure or recreation. Consequently, this factor weighs in favor of finding a profit motive.

To conclude, after giving due consideration to the record as a whole, we find that during the years in issue, petitioners did not carry on their Schedule C activities with an intent to make a profit. Accordingly, we sustain respondent's disallowance of petitioners' Schedule C losses.

## Section 6662(a) Accuracy-Related Penalty

We next consider whether petitioners are liable for the section 6662(a) accuracy-related penalties for the years in issue.

Section 6662 imposes a penalty equal to 20 percent of any portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations or to a substantial understatement of tax. See sec. 6662(a), (b)(1), and (b)(2). "Negligence" includes any failure of the taxpayer to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard" includes any careless, reckless, or intentional disregard of the Internal Revenue Code or its rules or regulations. Sec. 6662(c). The accuracy-related penalty will be imposed unless the taxpayers can demonstrate that they acted in good faith and with reasonable cause with respect to the

underpayment. See sec. 6664(c)(1). In determining the applicability of section 6664(c)(1), we weigh the particular facts and circumstances of each case. See sec. 1.6664-4(b), Income Tax Regs.

Petitioners maintain that the section 6662(a) accuracy-related penalties should not be imposed because they made a reasonable attempt to prepare accurate tax returns and relied upon the advice of a professional tax preparer. In addition, petitioners note that their returns for 1994 and earlier years were audited and resulted in the Internal Revenue Service's accepting the Schedule C activity losses as reported on those returns.

On the other hand, respondent maintains that petitioners, as educated individuals, should have known that "the size of the losses claimed * * * in relation to their sales, combined with the enjoyment and tax benefits they derived from the activity, was 'too good to be true'". Moreover, respondent asserts that petitioners' misclassification of their rental activities as "consulting" on their tax returns, as well as petitioners' overstatement of their automobile business mileage, see supra note 4, mandates the imposition of the section 6662(a) accuracy related penalties.

Although we are troubled by petitioners' misclassification of their rental activities and the overstatement of their business mileage, on balance, we agree with petitioners, and thus hold, that

the section 6662(a) accuracy-related penalty should not be imposed for either year under consideration.

We have considered all arguments made by the parties for contrary holdings, and, to the extent not discussed, find them to be without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent with respect to the deficiencies and for petitioners with respect to the addition to tax under section 6662(a)</u>.