T.C. Memo. 2001-117

UNITED STATES TAX COURT

RUTH N. NELSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5391-97.                          Filed May 17, 2001.

<u>Robert C. Barrett, Jr.</u>, for petitioner.

<u>Candace M. Williams</u>, for respondent.

MEMORANDUM OPINION

COUVILLION, <u>Special Trial Judge</u>: Respondent determined
deficiencies of $5,838 and $4,349 in petitioner's Federal income
taxes for 1992 and 1993, respectively, and accuracy-related
penalties under section 6662(a) of $1,167 and $869 for those
years.[1]

---

[1] Unless otherwise indicated, all section references are to
(continued...)

The issues for decision are: (1) Whether, for 1992 and 1993, an activity conducted by petitioner known as the Baton Rouge Volleyball Club constituted an activity not engaged in for profit under section 183(a), and, if so, (2) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence or disregard of rules or regulations for each of the years at issue. An ancillary issue is whether, for the year 1993, respondent's computational adjustment to petitioner's State income tax refund is correct.

## Background

In 1970, petitioner received a bachelor of arts degree in physical education and psychology from the University of Northern Colorado. Petitioner's particular focus in physical education is with the sport of volleyball. Petitioner participated in women's volleyball while in college. She was a member of the U.S. Women's National Volleyball Team during the early 1970's. In 1973, petitioner received a master of science degree in physical education from George Williams College in Downers Grove, Illinois. Also, from 1970 through 1972, petitioner served as head coach of the women's volleyball team, head coach of the men's tennis team, and physical education instructor at George

---

[1](...continued)
the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Williams College. In both years of coaching at George Williams College, petitioner's women's volleyball teams participated in National Championship tournaments.

From 1974 through 1981, petitioner was the head women's volleyball coach, physical education instructor, adviser to the men's volleyball team, and the head women's tennis coach (1974-1977) at the University of Houston in Houston, Texas. Also during this time period, petitioner served as president of the Houston Stars Volleyball Club and director of the organization's junior and coaches development programs conducting camps and clinics.

In 1981, petitioner accepted the opportunity to move to Baton Rouge, Louisiana, and serve as head coach of the women's volleyball team at Louisiana State University (LSU). Petitioner coached at LSU through 1985 and also served as an adviser to the men's volleyball team, as physical education instructor, and as supervisor of student teachers. Also during 1981, petitioner began operating the Baton Rouge Volleyball Club (BRVC), which is the subject activity in this case.

In 1985, petitioner left LSU but continued to live in Baton Rouge and operate BRVC. Around this time, petitioner began performing some consulting work for the women's volleyball program at the University of Iowa in Iowa City, Iowa. In 1987, petitioner began a brief stint as the head coach of the Dallas

Belles women's professional volleyball team in Dallas, Texas. Also, from 1985 through 1988, petitioner served as a volleyball color analyst for Iowa Public Television in Des Moines, Iowa. During 1988 and 1989, petitioner served as a consultant for various volleyball, sporting, and marketing organizations, including the Institute for International Sports in Kingston, Rhode Island, the International Players Promotion of Mulhouse, France, Plyometric, Inc., and Acadian Advertising.

During 1989, petitioner moved to Iowa City, Iowa, where she served as head women's volleyball coach, adviser to men's volleyball, and physical education instructor at the University of Iowa from 1989 through 1991. Also during 1989, petitioner served as head coach for the Springfield Junior Volleyball Club in Springfield, Illinois. During 1990 and 1991, petitioner served as an instructor in volleyball coaches' certification for the U.S. Volleyball Association.

Petitioner moved to Merrifield, Virginia, during 1991 to begin employment with Special Olympics International (SOI) in Washington, D.C. Petitioner was employed by SOI during both of the years at issue. Petitioner served in the following capacities during the following years with SOI: 1991-1992, sports marketing manager; 1992-1993, sports marketing director; and 1993-1995 sports/corporate marketing director. Petitioner

had previously served as a volleyball consultant for SOI from 1985 through 1991.

In 1995, petitioner returned to Texas to begin working as director of nonprofit marketing for Intellicall, Inc., IntelliMarketing Group (Intellicall) in Carrollton, Texas. Due to ongoing health problems, petitioner was forced to leave her employment with Intellicall during 1996. From that time until the date of trial in this case, petitioner has operated BRVC as her primary source of income in lieu of obtaining employment elsewhere. Petitioner operated BRVC in some capacity during each year since its 1981 formation, including those years of other work engagements following her 1985 departure from LSU.

During the course of her career, petitioner has received various professional honors and awards. Also, petitioner has had the opportunity to coach women's volleyball players who have been selected to play on U.S. Olympic teams and various professional women's volleyball teams. During 1984, petitioner toured Europe with the U.S. Junior Women's National Volleyball Team as a coach. Also, petitioner served as a technical expert to the 1984 U.S. Olympic Women's Volleyball Team.

Petitioner began operating BRVC in 1981 as a means of cultivating the talents of young volleyball players so that they could eventually play volleyball at college and professional levels. Through BRVC, petitioner conducted numerous volleyball

camps and clinics for junior high and high school-aged children, often conducting 50 or more camps during the summer months. Petitioner charged an admission fee for camps and also sold various volleyball paraphernalia in conjunction with the camps and clinics. In conjunction with a shoe company known as Aspri, petitioner designed and marketed her own volleyball shoe, the Ruth Nelson Sideout, which was sold through BRVC. Her volleyball shoe generated both sales and endorsement revenue for BRVC.

BRVC also conducted what petitioner referred to as membership programs, through which BRVC sponsored youth volleyball clubs to travel around the country and participate in various tournament competitions. BRVC received sponsorship money for its activities from various commercial organizations. Petitioner also made various public appearances and participated in a variety of speaking engagements and consulting services through BRVC. Also, through BRVC, petitioner produced a video for coaching girls' and women's volleyball, for which petitioner was paid royalties. From 1986 through the date of trial in this case, petitioner reported the following income, expenses, and net profits/losses from the operation of BRVC:[2]

---

[2] The record does not include petitioner's income tax returns for any other years of BRVC operation; i.e., 1981 through 1985 and 1995 through 1997. Counsel for respondent stated that tax return information for the years 1981 through 1985 was no longer available; however, no explanation was given for the lack

(continued...)

| Year | Gross Income | Expenses | Profit/(Loss) |
|------|------|------|------|
| 1986 | $47,970 | $45,970 | $  2,000 |
| 1987 | 49,432 | 49,461 | (     29) |
| 1988 | 44,339 | 65,437 | (21,098) |
| 1989 | 40,309 | 66,780 | (26,471) |
| 1990 | 13,364 | 36,564 | (23,200) |
| 1991 | 9,000 | 20,368 | (11,368) |
| 1992 | -0- | 20,106 | (20,106) |
| 1993 | 2,598 | 19,667 | (17,069) |
| 1994 | 1,638 | 14,125 | (12,487) |
| 1995 | --- | --- | --- |
| 1996 | --- | --- | --- |
| 1997 | --- | --- | --- |
| 1998 | 13,188 | 13,156 | 32 |

Around 1986, petitioner began to experience what she would come to realize was the beginning of a series of unfortunate circumstances that would affect both her professional and personal lives.  In 1986, the shoe company, Aspri, that had been paying endorsement moneys to BRVC for the Ruth Nelson Sideout, filed for bankruptcy.  Around May or June of 1987, petitioner suffered a serious back injury and underwent her first back surgery in 1988.  Consequently, petitioner was forced to hire additional help to perform some of the duties connected with BRVC that petitioner was unable to perform because of her injury and recuperation.

Petitioner relocated to Iowa during 1989 to accept a position as head coach of women's volleyball at the University of

_____

[2](...continued)
of return information for the years 1995 through 1997.

Iowa. Although it presented a wonderful career opportunity for petitioner, the unfortunate result of that move was the necessity of petitioner to "begin at square one" in developing and promoting a BRVC camp, clinic, and membership program in the Iowa area. Soon after her move, petitioner began experiencing additional health problems that required hospitalization during the early part of 1990. During 1991, petitioner had surgery in connection with these health problems. As a result, petitioner began to pare down the camp, clinic, and membership program activities of BRVC and started to focus on performing consulting work for various schools and organizations through BRVC. Petitioner could easily perform consulting work from home by viewing videotapes and conducting instructive sessions either in her home or by telephone conference.

When petitioner began her employment with SOI in 1991, her work there involved developing and maintaining relationships with companies for the sponsorship of various sport-specific activities. SOI did not place any limitation on petitioner's engaging in any outside business activities, but, rather, SOI encouraged petitioner to continue the activities of BRVC in order to supplement her wages from SOI. Consequently, petitioner continued to perform consulting work through BRVC.

In April 1992, SOI sent petitioner to Austria to develop a working relationship between SOI and Adidas. Also, petitioner's

duties included interviewing and hiring advertising agencies in Austria to raise money for Special Olympics. Unfortunately, in June 1992, petitioner suffered another injury to her back that required hospitalization and physical therapy. Nevertheless, petitioner spent approximately 9 months working for SOI in Austria between April 1992 and April 1993, making brief visits to the United States to visit her doctor about her most recent back injury.

Due to her back injuries, petitioner was classified as totally disabled, making her eligible for workmen's compensation benefits, and began receiving disability payments in August 1993. Petitioner underwent a second back surgery in February 1994 and continued receiving workmen's compensation disability payments through November of that year. Petitioner's doctor advised her to consider a change in professional lifestyle to one that would not place as much pressure on her back as what she experienced from volleyball camps, clinics, and membership programs for tournament play. Additionally, it appeared to petitioner that the sporting industry was undergoing a transformation in which consulting activities would be more lucrative than camps, clinics, and membership programs. Thus, petitioner abandoned thoughts of rejuvenating the camp, clinic, and membership programs of BRVC and began to focus primarily on consulting work,

which could be conducted largely by telephone conversations, the viewing of videotapes, and so forth.

Petitioner accepted a job with Intellicall in 1995 because that company provided petitioner with a flexible work schedule that was conducive to her health condition. For example, petitioner worked 4 hours at the office and 4 hours at home each day. At Intellicall, petitioner was involved in promoting a prepaid phone card program in the nonprofit sports marketing area. Petitioner's background in fund raising and sports marketing was an asset, and, additionally, Intellicall did not restrict petitioner's ability to conduct outside business activities. However, petitioner worked for only 1 year and was forced to return to total disability status in 1996. Petitioner underwent her third back surgery in 1997.

Petitioner realized that, in order to generate a profit, it would be necessary to make a dramatic change to the business activities conducted through BRVC that would be suitable with her seemingly chronic health problems. Consequently, petitioner began a prepaid phone card marketing and promotion business through BRVC. Through this activity, as best as the Court understands it, petitioner located corporate sponsors in the sports field to pay BRVC for the privilege of having their company's products or services advertised on the face of prepaid phone cards, which, in turn, petitioner sold to the general

public through BRVC. Petitioner created an internet website to sell such phone cards online. Additionally, petitioner, through BRVC, represented various athletes and artists and solicited corporations to sponsor the athletes or artists in exchange for endorsements of products or services. An image of the athlete or artist (or their artwork) was depicted on the face of a prepaid phone card, which was sold to the general public by BRVC. BRVC retained a portion of the phone card sales price and received a portion of any endorsement fee. In some cases, BRVC also received a percentage of the profits from the sales of artwork by a sponsored artist. At the time of the trial, petitioner continued to conduct this prepaid phone card activity through BRVC and had begun selling the official phone card for USA Volleyball.

On her Federal income tax return for 1992, petitioner reported wage income of $54,118 from SOI, taxable interest income of $2,757, and a taxable State income tax refund of $245. Petitioner also reported a $3,000 capital loss carryover, a $1,940 loss from rental real estate, and a $20,106 loss, on Schedule C, Profit or Loss From Business (Schedule C), from the operation of BRVC. Thus, petitioner reported total income and adjusted gross income of $32,074 for 1992. On Schedule C, petitioner reported zero gross receipts and total expenses of $20,106, resulting in the $20,106 Schedule C loss.

On her 1993 Federal income tax return, petitioner reported $38,029 in wage income from SOI, $2,225 in taxable interest income, and a $729 taxable State income tax refund.  Petitioner also reported a $3,000 capital loss carryover, a $1,817 loss from rental real estate, and a $17,069 Schedule C loss from the operation of BRVC.  Thus, petitioner reported total income and adjusted gross income of $19,097 for 1993.  On Schedule C, petitioner reported $2,598 in gross receipts and total expenses of $19,667, resulting in the reported $17,069 Schedule C loss.

In the notice of deficiency, respondent made the following adjustments to income for the years at issue:

| Adjustment | 1992 | 1993 |
|---|---|---|
| Hobby income | --- | $ 2,598 |
| Itemized deductions | $ 4,329 | (914) |
| Prior year refund | --- | 1,227 |
| Schedule C profit/loss | 20,106 | 17,069 |
| Standard deduction | (3,600) | --- |
| Total | $20,835 | $19,980 |

These adjustments resulted in deficiencies of $5,838 and $4,349, respectively, for 1992 and 1993.  Respondent also determined that petitioner was liable for the accuracy-related penalty under section 6662(a) for negligence or disregard of rules or regulations of $1,167.60 for 1992 and $869.80 for 1993.

## Discussion

For 1992, respondent's disallowance of $4,329 in itemized deductions and corresponding allowance of a standard deduction of $3,600 are computational adjustments that will be resolved by the Court's holding on whether BRVC was an activity not engaged in for profit for that year. Also, for 1993, respondent's determination of $2,598 in hobby income and allowance of an additional $914 in itemized deductions[3] are computational adjustments that will be resolved by the Court's holding on whether BRVC was an activity not engaged in for profit for 1993.

Additionally, for 1993, respondent determined that petitioner realized income from an unreported State income tax refund of $1,227. Respondent contends that this adjustment is computational based on the determination for 1992 that BRVC constituted an activity not engaged in for profit. The Court does not agree with respondent's treatment of this item for the following reasons.

In order for a taxpayer to be required to include a State income tax refund in income, the taxpayer must have received a

---

[3] Due to the increase in petitioner's adjusted gross income, petitioner's itemized deductions for medical and dental expenses were phased out entirely. However, in connection with BRVC, petitioner was allowed an additional $2,598 in miscellaneous itemized deductions subject to the 2-percent of adjusted gross income limitation of section 67(a)(which was also affected by the increase in adjusted gross income). This resulted in a $914 net increase in petitioner's 1993 itemized deductions.

tax benefit from the deduction of State income taxes in a prior year; i.e., the year for which the refund was received. See sec. 111(a). Moreover, a taxpayer is not required to include in income any portion of a refund that did not result in a reduction of taxes in the year the State income taxes were deducted. See sec. 1.111-1(a), Income Tax Regs. Petitioner complied with this rule of law on her 1992 and 1993 Federal income tax returns. On her 1992 Federal income tax return, petitioner deducted $2,658 on Schedule A for State income taxes. During 1993, petitioner received a $1,227 refund of her 1992 State income taxes. On her 1993 Federal income tax return, petitioner reported $729 as a taxable refund of State income taxes. Petitioner reported only $729 of the total refund in her 1993 income because her itemized deductions for 1992 exceeded her allowable standard deduction for that year by only $729. Thus, the maximum tax benefit received by petitioner in 1992 for the deduction of State income taxes was $729 and that is the amount she was required to and did in fact report as income on her 1993 return.[4]

When respondent determined that BRVC was an activity not engaged in for profit for 1992, respondent computationally disallowed petitioner's 1992 itemized deductions in their

---

[4] See sec. 1.111-1(b)(2)(ii) and (3), Income Tax Regs.; Prewitt v. Commissioner, T.C. Memo. 1995-24. Respondent adopted this rationale in Rev. Rul. 93-75, 1993-2 C.B. 63.

entirety and, in lieu thereof, allowed petitioner the standard deduction for that year. Thus, following respondent's adjustments for 1992, petitioner did not realize any tax benefit in 1992 from the deduction of State income taxes, and, consequently, petitioner would not be required to include any of her 1992 State income tax refund in her 1993 income.[5] Rather than including an additional amount in petitioner's 1993 income, respondent should have reduced petitioner's 1993 income by $729, the amount of State income tax refund that petitioner reported as taxable income on her 1993 return.

Consequently, if the Court sustains respondent's determination that BRVC was an activity not engaged in for profit in 1992, thus upholding the disallowance of itemized deductions for that year, petitioner would not be required to include any State income tax refund in her 1993 income.[6] Thus, if respondent is sustained on the primary issue in this case, a computation

---

[5] It is notable that, even if there had been an increase in 1992 itemized deductions (which did not happen in this case), respondent should have included no more than $498 in petitioner's 1993 income ($1,227 - $729 = $498) because petitioner had reported $729 on her 1993 return.

[6] On the other hand, if petitioner prevails on the issue of whether BRVC was an activity not engaged in for profit, this adjustment would be remedied as a result thereof because respondent characterizes it as a computational adjustment flowing from the determination that BRVC was an activity not engaged in for profit.

under Rule 155 will be required to remedy the erroneous adjustment made by respondent.[7]

The principal issue is whether petitioner's Baton Rouge Volleyball Club activity was an activity not engaged in for profit under section 183(a) for 1992 and 1993. Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed. Section 183(b)(1), however, provides that deductions that are allowable without regard to whether the activity is engaged in for profit shall be allowed. Section 183(b)(2) further provides that deductions that would be allowable only if the activity were engaged in for profit shall be allowed, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of" section 183(b)(1).

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The Court's inquiry is directed to whether the taxpayer engaged in the activity with the

---

[7]    In this instance, petitioner's income determined in the notice of deficiency should be reduced by $1,956; i.e., $1,227 for the erroneous increase of income in the notice of deficiency and $729 for the amount reported by petitioner on her 1993 return.

"actual and honest objective of making a profit". <u>Ronnen v. Commissioner</u>, 90 T.C. 74, 91 (1988); <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one but there must be a good faith objective of making a profit. See <u>Dreicer v. Commissioner</u>, <u>supra</u> at 645; sec. 1.183-2(a), Income Tax Regs. The determination of whether the requisite profit objective exists is based on all the surrounding facts and circumstances. See <u>Golanty v. Commissioner</u>, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. Greater weight is to be given to the objective facts than the taxpayer's mere statement of his intent. See <u>Dreicer v. Commissioner</u>, <u>supra</u> at 645; sec. 1.183-2(a), Income Tax Regs. The taxpayer has the burden of proving the requisite intention and that respondent's determination that the activity was not engaged in for profit is incorrect. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933).

Although the question of the taxpayer's profit motive is a subjective one, objective indicia may be considered to establish the taxpayer's true intent. See sec. 1.183-2(a), Income Tax Regs. Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine objective factors to be considered in ascertaining the taxpayer's intent. These factors are: (1) The

manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity.  These factors are not merely a counting device where the number of factors for or against the taxpayer is determinative but, rather, all facts and circumstances must be taken into account, and more weight may be given to some factors than to others.  Cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).  Not all factors are applicable in every case, and no one factor is controlling.  See Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v. Commissioner, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.

The first factor is the manner in which petitioner conducted BRVC.  The Court considers that petitioner conducted the activities of BRVC in a businesslike manner.  She maintained a separate checking account for BRVC and retained canceled checks, credit card statements, and receipts to verify business expenses.

She admitted that she occasionally deposited personal funds into the BRVC checking account when BRVC experienced a negative cash-flow, but this fact does not indicate that petitioner lacked profit motive. Rather, the Court views this as providing the necessary capital to keep the activity going.

Petitioner also paid some personal expenses out of the BRVC checking account and had some credit cards that she used for both business and personal expenses. However, through receipts, canceled checks, and credit card statements, petitioner kept track of which expenses were business as opposed to personal, and petitioner made no attempt to deduct personal expenses for income tax purposes. Petitioner sought the advice and services of a certified public accountant in the preparation of her Federal income tax returns during the years of BRVC operation. For the years at issue, no adjustments were made by respondent with respect to the expenses claimed on the ground that such claimed expenses were personal.

Moreover, for approximately the first 10 years of BRVC operation, petitioner kept ledgers in connection with the volleyball camps, clinics, and membership programs for tournament play conducted by BRVC. Petitioner stopped maintaining these ledgers around 1992, subsequent to the cessation of camps, clinics, and membership programs through BRVC. After 1992, petitioner maintained computer records in connection with the

income and expenses of BRVC.  While petitioner's record-keeping procedures may not have been as meticulous as might be desired, they were sufficient to keep an accurate account of BRVC income and expenses.

The record reflects that petitioner expended great effort to advertise and promote the camps, clinics, and membership programs for tournament play conducted through BRVC.  Indeed, an activity such as BRVC is not likely to generate gross income in excess of $40,000 for 5 or more successive years[8] without a concerted effort at promotion.  Additionally, through BRVC, petitioner endeavored to develop and market a volleyball shoe, the Ruth Nelson Sideout, in collaboration with Aspri shoe company.  Following the bankruptcy of Aspri, petitioner's move to Iowa, a series of health problems, and her beginning realization that camps, clinics, and membership programs were no longer going to provide potential profits for BRVC, petitioner began to focus the activities of BRVC in the direction of consulting services.  Later, during the mid-1990's petitioner attempted another transformation of the activities of BRVC by entering into the prepaid telephone card promotion industry.  It is clear that petitioner developed a pattern of changing the activities of BRVC

---

[8]    Although the record contains no Federal income tax return information for years prior to 1986, the record indicates that BRVC generated gross income of approximately $50,000 for each of the years 1984 and 1985.

in an attempt to make the business more profitable.  Despite the fact that petitioner's efforts in this regard have met with limited success, they highlight petitioner's profit motive in connection with BRVC.

The second factor is the expertise of petitioner and her advisers, if any.  Prior to forming and operating BRVC, petitioner had many years of education and experience in playing and coaching volleyball at varying levels of difficulty.  Also, petitioner had previous experience with sports camps, clinics, and tournament play.  Petitioner's experience in this field, no doubt, led to the relatively high gross income generated by BRVC in the mid- to late-1980's.  Also, petitioner's vast experience in the world of volleyball assisted her in developing and marketing the Ruth Nelson Sideout in conjunction with Aspri.

When BRVC began experiencing a decrease in revenues, petitioner sought the advice of a business consultant and attended various seminars in an attempt to make BRVC more profitable.  Finally, prior to shifting BRVC activities into the marketing and sales of prepaid phone cards, petitioner spent a year working in this field for Intellicall, learning the nuances of this relatively new industry.  Petitioner's background and experience in volleyball and sports marketing, as well as her attempts to attain knowledge and advice in areas she lacked,

indicated petitioner's ability and desire to derive a profit from her BRVC activity.

The third factor is the time and effort expended by petitioner on the activities of BRVC. During the first several years of operation, petitioner spent at least 20 hours per week conducting the activities of BRVC such as developing camps, clinics, and membership programs and attending speaking engagements, while simultaneously coaching and recruiting athletes for LSU. It was possible for petitioner to devote this amount of time to BRVC because much of the camp, clinic, and tournament activity was conducted on weekends and during summers. Likewise, many of petitioner's speaking engagements and consulting activities conducted through BRVC were performed during the evenings and on weekends. Moreover, petitioner's employment at LSU benefited BRVC in that petitioner was allowed to use the school's facilities to conduct many activities, including camps and clinics, thus saving BRVC the expense of renting appropriate facilities. Rather than hindering the operations of BRVC, petitioner's employment at LSU proved complementary thereto.

From 1986 through 1988, petitioner devoted nearly all of her time to BRVC, and the substantial majority of her income in those years was derived from this activity. During her years in Iowa, i.e., 1989 through 1991, petitioner devoted at least 20 to 30

hours per week on the activities of BRVC.  Due to the nature of the activities conducted through BRVC during those years, i.e., mostly consulting services, petitioner was able to promote and conduct the same activities simultaneously with the duties of her employment.

Although petitioner was employed by SOI during the years at issue, she devoted most of her free time to developing contacts useful to the activities of BRVC.  Additionally, due to the nature of petitioner's work with SOI, she was able to utilize her duties at SOI to enhance the potential success of BRVC.  For example, through SOI, petitioner was able to make many professional contacts in the world of volleyball and sports marketing that held the potential for enhancing the operations and profitability of BRVC.

Respondent contends that petitioner's full-time employment during various years of BRVC operation, such as with LSU, the University of Iowa, and SOI, precluded petitioner from devoting sufficient time to BRVC so that the activity could rise to the level of a trade or business.  The Court disagrees.  This Court has previously recognized the common-sense notion that a taxpayer may engage in more than one trade or business simultaneously.  See Gestrich v. Commissioner, 74 T.C. 525, 529 (1980), affd. without published opinion 681 F.2d 805 (3d Cir. 1982); Sherman v. Commissioner, 16 T.C. 332, 337 (1951).  Moreover, this Court has

stated that a taxpayer's engaging in full-time employment in addition to conducting a profit-seeking activity can be a positive factor illustrating the taxpayer's motivation, rather than a negative element as often argued by respondent when a taxpayer devotes time to other activities.  See Dickson v. Commissioner, T.C. Memo. 1986-182.  In the instant case, the Court views petitioner's full-time employment history as a complement to the activities of BRVC rather than a negative factor.  The Court is satisfied that petitioner expended sufficient time and efforts on BRVC during the years at issue and prior and subsequent thereto to favor a profit motive in connection therewith.

Respondent contends that the fourth factor, i.e., the expectation that the assets used in the activity may appreciate in value, weighs against petitioner.  Respondent argues that BRVC owned no assets other than a computer, fax machine, two VCR's, and some sporting equipment, all of which were depreciating assets.  Thus, respondent argues, since petitioner had no prospect of realizing any appreciation of BRVC assets, this is an indication that petitioner lacked a profit objective.  The Court finds this argument to be unpersuasive.  There exist many business activities the nature of which do not require and are not conducive to the ownership of property that may appreciate in value, and BRVC was one such activity.  The Court finds that the

fourth factor is not directly relevant in the instant case. Moreover, insofar as this factor is relevant, it would weigh in favor of petitioner. The fact that BRVC purchased and frequently utilized the aforementioned equipment indicates an effort by petitioner to operate BRVC in a professional manner.

The fifth factor examines whether the taxpayer experienced success in carrying on other similar or dissimilar activities. Although there is some indication in the record that petitioner operated a similar activity sometime prior to 1981, the record is devoid of any details regarding the profitability or manner and length of conduct of this business. Thus, the Court finds that this factor is inapplicable to the instant case.

The sixth factor is the history of the activity's income and losses. Although BRVC sustained losses for nearly each year of its operation, the gross income of BRVC was consistently in the 40- to 50-thousand dollar range for the years 1986 through 1989. Although no return information was submitted for years prior to 1986, the record indicates that BRVC generated gross income close to $50,000 for each of the years 1984 and 1985. BRVC gross income dropped to approximately $13,000 in 1990, $9,000 in 1991, and zero in 1992. Respondent contends that this dramatic decline in gross income, coupled with the history of losses, indicates that petitioner lacked profit motive in the operation of BRVC. The Court disagrees.

Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not indicate that an activity is not engaged in for profit. See sec. 1.183-2(b)(6), Income Tax Regs. The Court does not believe that the diminishing of BRVC's gross income, nor the history of losses, can be attributed to a lackadaisical attitude on the part of petitioner with respect to the operation of BRVC. In other words, the income and loss problems of BRVC did not result from a lack of profit motive by petitioner. Rather, the decrease in BRVC gross income for 1990 and subsequent years is readily attributable to a series of untoward events, including the bankruptcy of Aspri, petitioner's relocation from Louisiana to Iowa, petitioner's health problems, and, subsequently, petitioner's period of overseas employment with SOI. Each of these factors, which the Court has previously discussed in greater detail, contributed to the waning of BRVC's income. In addition, the losses can be attributed to some measure of poor business judgment on the part of petitioner. However, poor business judgment does not, necessarily, equate with a lack of profit motive.

In response to each unfortunate circumstance, petitioner amended the type and magnitude of BRVC activities, indicating her desire to earn a profit. The Court finds it also notable that the expenses of BRVC decreased dramatically from 1990 forward, as

compared to prior years' expenses. This illustrates an obvious effort by petitioner to reduce BRVC losses in a time of extreme revenue shortages. It is apparent that petitioner's efforts began to pay off when, in 1993, BRVC again generated gross income. Although BRVC expenses remained relatively low, losses were nevertheless sustained during 1993 and 1994. However, by 1998 BRVC began experiencing financial improvements as BRVC reported gross income of $13,188 and a net profit of $32.[9] This pattern of income and losses, coupled with petitioner's actions in response thereto, indicates that petitioner possessed a profit motive in operating BRVC.

The seventh factor is the amount of occasional profits of BRVC, if any. The record reflects that BRVC realized a profit in only 2 years of operation, $2,000 in 1986 and $32 in 1998. A minuscule loss of $29 was sustained in 1987. Admittedly, viewed in the most favorable light these profits were sporadic and small. This fact does not weigh in favor of a profit motive. Nevertheless, in this case the Court considers that the infrequency of net profits is not as significant as the pattern of income and expenses. The fact that profits were small and occasional does not outweigh the fact that, when the receipts of

---

[9] The Court is puzzled by the omission of return information for 1995 through 1997. Nevertheless, given the income pattern in other years, the Court surmises that BRVC experienced a steady increase in gross income between the years 1994 and 1998.

BRVC began to decrease, a commensurate decrease in expenses was accomplished in attempt to remedy the situation. Additionally, petitioner carried out recurrent conversions in the activities of BRVC in an ongoing effort to make the business profitable. The fact that petitioner's efforts proved to be somewhat fruitless does not require a finding of no profit motive.

The eighth factor is petitioner's financial status. From 1981 through 1985, petitioner was paid wage income by LSU, although the amounts of such wage income are not a part of this record. During 1986, 1988, and 1998, petitioner's only income was derived from BRVC with the exception of $2,782 in interest income in 1986, $3,339 in interest income in 1988, and $3,103 in interest and dividend income in 1998.[10] For 1987, petitioner had wage income of $12,250 and interest income of $3,498. For 1989, petitioner reported wages of $17,808, interest income of $4,173, a $2,509 gain from the sale of an automobile, and $880 in unemployment compensation.[11] For 1990, petitioner reported wages

---

[10] In addition to her loss from BRVC for 1988, petitioner claimed a capital loss of $153. For 1998, petitioner also reported a capital loss of $719 and a net operating loss carryover of $6,203.

[11] For 1989, petitioner also reported, in addition to the BRVC loss, a $3,000 capital loss, a loss of $8,945 from the operation of rental real estate, and a net operating loss carryover of $12,055.

of $40,207 and interest income of $3,784.[12]  For 1991, petitioner

reported wages of $57,344 and interest income of $4,139.[13]

During the years at issue, petitioner was employed by SOI

and earned wages of $54,118 and $38,029 for 1992 and 1993,

respectively.  Additionally, for 1992, petitioner reported

interest income of $2,757, a State income tax refund of $245, a

$3,000 capital loss, and a $1,940 loss from the operation of

rental real estate.  For 1993, petitioner reported interest

income of $2,225, a State income tax refund of $729, a $3,000

capital loss, and a loss of $1,817 from the operation of rental

real estate.

For each of the years of operation, the amounts of income

derived by petitioner outside of BRVC are not so high as to

indicate that petitioner's primary objective in operating BRVC

was to generate tax savings, particularly in light of the other

losses reported on petitioner's returns for various years.  On

the contrary, these levels of other income and losses indicate

that petitioner lacked the luxury of a large amount of disposable

income that would enable her to fritter away tens of thousands of

dollars each year on a volleyball hobby.  The tax incentive for

---

[12]     In addition to the BRVC loss for 1990, petitioner
reported a $3,000 capital loss, a $3,057 loss from the operation
of rental real estate, and a net operating loss carryover of
$36,517.

[13]     Additionally, petitioner reported a $3,000 capital
loss, a $5,512 loss from the operation of rental real estate, and
a $24,388 net operating loss carryover.

incurring large expenditures in a hobby type business are much greater for a taxpayer who has substantial income from other sources. See Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

Finally, the Court must examine the degree of personal pleasure and recreation petitioner may have derived from the conduct of BRVC. Petitioner admittedly had a great love for the sport of volleyball and experienced a certain level of personal pleasure from conducting volleyball camps and clinics and sponsoring a membership program for tournament play, thereby promoting the development of young volleyball athletes. However, the Court believes that the BRVC activities conducted by petitioner also proved, at times, to be demanding, exhausting, and expensive, both physically and financially. Nevertheless, the mere fact that a taxpayer derives a certain amount of personal pleasure from an activity does not, in and of itself, render the activity not engaged in for profit. See sec. 1.183-2(b)(9), Income Tax Regs. Moreover, a business will not be recharacterized as a hobby merely because the owner finds the activity pleasurable; i.e., suffering has never been made a prerequisite to deductibility. See Jackson v. Commissioner, supra.

The majority of people who engage in an activity for primarily pleasurable purposes, i.e., a hobby, choose an activity that differs greatly from experiences provided in their daily

professional lives. Human nature guides us to choose a hobby that provides us with a mental and physical respite from the rigors of a career. In this case, BRVC did not provide petitioner a respite from her career but, rather, was essentially an extension and potential augmentation of her professional life as a volleyball player and coach. BRVC did not allow petitioner to escape from her professional life, rather, the two appear to have been intertwined. This factor does not weigh against a profit motive on the part of petitioner.

The Court acknowledges that this case presents a very close question, one in which each factor had to be carefully scrutinized and balanced in order to arrive at the ultimate conclusion. However, upon considering each of the underlying facts in this case in the aggregate and evaluating each of the nine factors giving greater weight to some than others, the Court believes that the scale tips in favor of a profit motive on behalf of petitioner.

Therefore, on this record, the Court holds that petitioner has sustained her burden of establishing that she had an actual and honest objective of making a profit in her BRVC activity. Accordingly, the Court holds that BRVC, for 1992 and 1993, did not constitute an activity not engaged in for profit under section 183(a). Thus, petitioner is entitled to deduct the

losses realized in connection with BRVC during 1992 and 1993.[14] Petitioner is sustained on this issue.

The final issue is whether petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence or disregard of rules or regulations for each of the years at issue. Section 6662(a) provides that, if it is applicable to any portion of an underpayment in taxes, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which section 6662 applies. Since the Court has held in favor of petitioner on the issue of whether BRVC was an activity not engaged in for profit during the years at issue and thus has negated all of the adjustments in the notice of deficiency, there exists no further underpayment to which the accuracy-related penalty under section 6662(a) may be applied. Thus, petitioner is not liable for the section 6662(a) penalty.

<u>Decision will be entered</u>

<u>for petitioner.</u>

---

[14] Respondent conceded that petitioner substantiated the expenses claimed on her 1992 and 1993 Federal income tax returns in connection with BRVC.